**DAVE GREYTAK ENTERPRISES, INC., d/b/a Nucar Mazda, a Delaware Corporation, Plaintiff,**

v.

**MAZDA MOTORS OF AMERICA, INC., a California Corporation, Defendant.**

Civ. A. No. 11997.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 7, 1991.
Decided: Jan. 28, 1992.

**16**

Henry N. Herndon, Edward M. McNally, and Peter A. Pietra, of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.

Somers S. Price, Jr., and John E. James, of Potter, Anderson & Corroon, Wilmington, and Job Taylor, III, and Elahna R. Strom, of Latham & Watkins, New York City, for defendant.

OPINION

JACOBS, Vice Chancellor.

This action concerns a dispute between Dave Greytak Enterprises, Inc., d/b/a Nucar Mazda ("Nucar"), a local Mazda automobile dealer, and Mazda Motors of America, Inc. ("Mazda"), an automobile manufacturer, over whether Nucar is entitled to relocate its dealership from its present location at North Dupont Highway in New Castle, Delaware, to a proposed new location in Newark, Delaware. Mazda advised Nucar that it intends to appoint a new dealer for the Newark area. Under the Dealer Agreement between Mazda and Nucar, Nucar cannot operate a dealership at any location other than its current New Castle location, unless it obtains Mazda's approval. Therefore, Nucar sought Mazda's permission to become the Newark dealer, by being allowed to relocate its facility to the proposed Newark site. Mazda refused that request.

Nucar then filed this action on March 7, 1991, alleging that Mazda's refusal to permit it to relocate to Newark constituted a breach of the Dealer Agreement, tortious interference with prospective contractual relations, and various statutory violations. Mazda moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Chancery Court Rule 12(b)(6). Because the parties filed evidentiary matter outside the pleadings during the course of briefing, the motion will be treated as one for summary judgment. *See* Chancery Court Rule 12(b). This is the decision of the Court on defendant Mazda's motion for summary judgment.

I.

The following facts, derived from the complaint and affidavits, are undisputed.

Nucar opened the first Mazda dealership in New Castle County, Delaware in 1977, and at that time operated out of a facility located on Kirkwood Highway. During the next six years Nucar successfully expanded its Mazda market, focusing primarily on the Newark area. In 1983, Nucar, with Mazda's consent, moved its operation to its present location at 172 North DuPont Highway, New Castle. Despite that location, Nucar continued to focus its sales

efforts on Newark area customers. From the outset Nucar has been a successful dealership, consistently performing in the top ten percent of Mazda dealerships in sales, parts, and service.

The Mazda–Nucar relationship is expressed in a form agreement known as the "Dealer Agreement." That contract has provisions that are too numerous to summarize here; however, its relevant features are as follows: the Dealer Agreement does not limit where Nucar may sell, nor does it provide Nucar an exclusive right to sell in any area. It expressly limits Nucar's right to operate its dealership to the "Approved Location," which is contractually defined as the Dealer's address shown on the signature page, *i.e.*, 172 North DuPont Highway, New Castle. The Dealer Agreement does not limit Mazda's right to appoint new dealers. However, it does provide that if a newly-appointed dealer will be "near" an existing dealer's approved location, Mazda must give the existing dealer at least sixty days' prior written notice "for the purpose of enabling the parties to discuss whether there exist any mutually agreeable alternatives to the proposed action." (Dealer Agreement, § VI(2)).

The Dealer Agreement also establishes detailed nonjudicial dispute resolution procedures, including arbitration, to which either party must resort before engaging in litigation. One provision that appears in the "Dispute Resolution" section, and upon which Nucar importantly relies in support of its claims, states as follows:

DEALER and MAZDA recognize that from time to time disputes may arise between them involving matters affecting their business relationship and performance under the MAZDA Dealer Agreement. DEALER and MAZDA further recognize that frequent disputes or the continuation of unresolved disputes between them is not consistent with the spirit of dealing in good faith between them, and may interfere with fulfilling the various purposes of the MAZDA Dealer Agreement, including without limitation those of maintaining high levels of customer satisfaction, the image, reputation and goodwill of the MAZDA Trademarks, MAZDA Products.... Accordingly, DEALER and MAZDA agree in all circumstances to seek prompt and expeditious non-judicial resolution of disputes between them through good faith negotiations, involving open, frank and constructive discussions having reference to the spirit, intents and purposes of the MAZDA Dealer Agreement.

On July 5, 1989, Mazda notified Nucar of its intention to select a new dealer for Newark. By letter dated July 11, 1989, Nucar expressed to Mazda its desire to relocate its facility to Cleveland Avenue in Newark, and to meet with Mazda to discuss that proposal. In a July 24, 1989 letter to Mazda, Nucar reaffirmed its desire to relocate to Newark. Thereafter, no further discussions about that subject took place for about one year.

The dialogue resumed on September 21, 1990, when Mazda advised Nucar that it was about to appoint a new dealer (not Nucar) in the Newark area. On September 25, 1990, Nucar's attorney responded to Mazda, contending that Mazda's unilateral decision to appoint another dealer, and not to permit Nucar to relocate to Newark, would violate the Dealer Agreement, unless Mazda first gave written notice, followed by discussions of "whether there exist any mutually agreeable alternatives." Nucar's counsel further admonished that if the dispute could not be resolved in that fashion, Mazda was entitled to have the dispute arbitrated. Finally, Nucar's attorney threatened to seek judicial protection if Mazda proceeded with its plans without following the dispute resolution procedures in the Dealer Agreement.

Three days later, on September 28, 1990, Mazda extended the Dealer Agreement to December 31, 1991. (Compt., ¶ 23.)

By letter dated October 5, 1990, Mazda responded that it would listen to any "new proposals that you [Nucar] have in the Newark, Delaware market area," and invited Nucar to contact it no later than October 10, 1990 to review those proposals. Approximately six weeks later, Nucar submitted a proposal to relocate to 4304 Kirk-

wood Highway, a location not even in Newark.

After hearing nothing further from Mazda, Nucar's President, Mr. Greytak, discussed Nucar's relocation proposal with Mazda senior representatives at a National Automobile Dealer's Association convention. According to the complaint, Mazda's representatives informally assured Mr. Greytak that Nucar would be allowed to relocate to Newark. However, in a letter dated February 20, 1991, Mazda formally advised Nucar that its relocation proposal was unacceptable, because (i) the Kirkwood Highway location has no major import competition within close proximity, (ii) the proposed site is 5.5 miles from the major automotive facilities in the Newark area, and (iii) major import competition is located on the DuPont Highway and in Newark, and Nucar's proposed location is between 5–8 miles from both locations. Although Nucar submitted no proof on the point, Mr. Greytak, in his affidavit, expressed his "belief" that Mazda's stated reasons were a pretext and that good faith negotiations, conducted fairly, would lead to a decision to permit Nucar to relocate to its proposed Newark site. That position forms the basis of this action by Nucar against Mazda.

## II.

In its five count complaint, Nucar alleges that Mazda breached the Dealer Agreement in various respects, committed tortious interference with prospective contractual relations, and violated various provisions of the Delaware Franchise Security Law, 6 *Del.C.* § 2551, *et seq.* ("FSL"), and the Delaware Motor Vehicle Franchising Practices Act, 6 *Del.C.* § 4901, *et seq.* ("MVFPA"). Nucar requests relief of every conceivable kind, including an injunction prohibiting Mazda from appointing a new dealer for the Newark area and requiring Mazda to deal with Nucar in good faith, specific performance (an order directing Mazda to arbitrate its dispute with Nucar),

compensatory damages, punitive damages, and counsel fees.

Mazda's position, simply put, is that in these circumstances it has the absolute right to appoint a new dealer (other than Nucar) at a Newark location, that it has no obligation under either the Dealer Agreement or any applicable statute to grant Nucar's request to relocate to Newark, and that Mazda has satisfied whatever obligation it may have to notify and consult with Nucar. Therefore, Mazda concludes, this action must be dismissed because no cognizable claim for relief has been alleged in the complaint or otherwise demonstrated on the record. For the reasons which follow, I agree.

## III.

Nucar first claims that Mazda has violated the FSL, namely, 6 *Del.C.* §§ 2552(g), (h), and (i), and § 2554.[1] Specifically, Nucar alleges that by announcing its intention to appoint a new Mazda dealer within Nucar's Approved Location, Mazda unjustly terminated and refused to renew the franchise between it and Nucar in violation of § 2552. (Compt., ¶¶ 51, 52.) Nucar further claims that Mazda violated § 2554 by failing to provide adequate notice of its intention to appoint a new dealer within Nucar's approved area of operations. (*Id.,* ¶ 53.)

These allegations on their face do not state cognizable claims for relief under the FSL. That statute applies only to "franchise" relationships, as that term is statutorily defined, and the Nucar/Mazda relationship is not a "franchise" within the meaning of the FSL. In addition, Nucar's claims are controverted by its own pleading.

"Franchise". is defined in the FSL as:

... a contract or other arrangement governing the business relationship within this State between a franchised distributor and a franchisor where the fran-

---

1. 6 *Del.C.* §§ 2552(g)–(i) state:

   (g) No franchisor may unjustly terminate a franchise.

   (h) No franchisor may unjustly fail or refuse to renew a franchise.

   (i) No franchisor may unjustly refuse to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years.

chised distributor is required to pay more than $100 to enter into such contract or other arrangement. . . .

6 *Del.C.* § 2551(3). The Nucar–Mazda relationship does not satisfy that test, because Nucar did not pay Mazda more than $100 to enter into their dealership relationship. Indeed, the Dealer Agreement recites in the General Conditions, that "DEALER and MAZDA further acknowledge that . . . the business relationship between them does not create any franchise . . . or any duties arising from such relationship," and that "DEALER has not paid to MAZDA and MAZDA has not received any fee or charge for the right to enter into the MAZDA Dealer Agreement or engage in any of the business activities contemplated hereby."

Nucar insists, however, that because it spent approximately $30,000 on equipment and signs to start up its Mazda dealership, the FSL's $100 payment requirement is satisfied. But the complaint does not allege, nor does the record evidence, that Nucar was required to pay that sum as a condition precedent to entering into its relationship with Mazda. The $30,000 must therefore be regarded as an initial investment reasonably and customarily required of dealers to enable them to perform and carry out their dealership agreement. Such an investment has been held not to satisfy the payment requirement of § 2551(3). *Del–Way Petroleum Co., Inc. v. Phillips Petroleum Co.,* Del.Ch., C.A. No. 4802, 1977 WL 2568, Brown, V.C. (Mar. 10, 1977); *A.R. Dervaes Co., Inc. v. Houdaille Industries, Inc.,* Del.Ch., C.A. No. 6471, 1981 WL 7625, Marvel, C. (Sept. 29, 1981). Clearly the FSL does not, and was not intended, to reach the type of dispute involved in this case. *See* Preamble to 57 Del.L.Ch. 693; *Paradee Oil Co., Inc. v. Phillips Petroleum Co.,* Del.Ch., 320 A.2d 769, 775 (1974), *aff'd,* Del.Supr., 343 A.2d 610 (1975) (discussing purpose of statute).[2]

Moreover, Nucar contradicts its own FSL-based claims in the complaint, which alleges at ¶ 23 that "[o]n September 28,

1990, Mazda extended the duration of the Mazda Dealer Agreement to December 31, 1991." That allegation controverts Nucar's claim that Mazda unjustly terminated, and failed or refused to renew, Nucar's franchise. That averment is also fatal to Nucar's claim under § 2554, which provision requires at least ninety days' notice for "any *termination of* . . . or *election not to renew* a franchise." (Emphasis added.) Finally, even if Mazda were required to provide such notice, the uncontroverted record establishes that it did. (*See* pp. 17–18, *supra.*)

Accordingly, the complaint fails to allege actionable violations of the FSL.

### IV.

Nucar next claims that Mazda violated §§ 4906 and 4913 of the Delaware Motor Vehicle Franchising Practices Act ("MVFPA"). 6 *Del.C.* §§ 4906, 4913. In its complaint Nucar alleges that by announcing its intention to appoint a new Mazda dealer in the Newark area (other than Nucar), Mazda "effectively terminated" Nucar's dealer franchise by taking nearly half of Nucar's customer base without good cause and in bad faith. That conduct is claimed to violate § 4906, which prohibits a manufacturer from terminating, canceling, or failing to renew a franchise with a licensed new motor vehicle dealer, unless (*inter alia*) the manufacturer has good cause for, and has acted in good faith with regard to, the cancellation, termination, or nonrenewal. Nucar also alleges that Mazda's establishment of a new dealer in Nucar's market, and Mazda's failure to consider Nucar's proposal to relocate, constituted predatory and discriminatory conduct in violation of § 4913(b)(14), which prohibits any manufacturer from (*inter alia*) "engag[ing] in any predatory practice or discrimination against any new motor vehicle dealer."

■ In seeking to apply this statute to Mazda, Nucar again overreaches. As with the FSL, the MVFPA does not, and was not

---

**2.** Although the Dealer Agreement is not a "franchise" under the FSL, it is a "franchise" within

the meaning of the MVFPA. Mazda does not dispute that. *See* 6 *Del.C.* § 4902(6).

intended to, reach the kind of dispute involved here, *i.e.,* Mazda's decision to appoint a new dealer for Newark and not to allow Nucar to relocate there. Nothing in the MVFPA prohibits Mazda from making those decisions or otherwise renders them illegal. Indeed, the only MVFPA provision that arguably bears on Mazda's conduct here is § 4915(a), which states that:

In the event that a manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealer or relocating an existing new motor vehicle dealer within or into a relevant market area where the same line-make is then represented, the manufacturer shall in writing first notify the Public Service Commission and each new motor vehicle dealer in such line-make in the relevant market area of the intention to establish an additional dealer or to relocate an existing dealer within or into that market area. Within 30 days of receiving such notice or within 30 days after the end of any appeal procedure provided by the manufacturer, any such new motor vehicle dealer may file with the Public Service Commission a protest to the establishing or relocating of the new motor vehicle dealer. When such a protest is filed, the Public Service Commission shall inform the manufacturer that a timely protest has been filed, and that the manufacturer shall not establish or relocate the proposed new motor vehicle dealer until the Public Service Commission has held a hearing, nor thereafter, unless, the Public Service Commission has determined that there is good cause for permitting the addition or relocation of such new motor vehicle dealer.

That is, under certain conditions, § 4915(a) of the MVFPA entitles an existing dealer to protest the appointment of a new dealer, and to cause the Public Service Commission ("PSC") to hold a hearing as to whether good cause exists for permitting the new dealership. However, under § 4915 that entitlement arises only where the manufacturer proposes to establish a new dealership within the existing dealer's "relevant market area", which is defined as:

the area within a radius of 10 miles from the intended site of a proposed additional dealership, *except that in New Castle County the radius shall be 7 miles from the intended site of a proposed additional dealership.*

6 *Del.C.* § 4902(10). (Emphasis added.) Thus, the MVFPA would afford Nucar the right to protest the creation of a new dealership in Newark, but only if that new dealership were to be located within a seven-mile radius from Nucar's present (New Castle) location. But here it is conceded that the proposed new dealership would fall outside that seven-mile radius. (Oral Arg. Tr. at 36, 40–41.) Therefore, Nucar has no right to protest the creation of a Newark dealership under § 4915, which is the only MVFPA provision arguably germane to this dispute.

■■■ That perhaps is why Nucar attempts to allege violations of other MVFPA provisions, namely, 6 *Del.C.* §§ 4906 and 4913. The effort cannot withstand scrutiny. Mazda is said to have violated § 4906 in that its decision to appoint a new dealer for Newark "effectively terminated" Nucar's dealer franchise. (Compt., ¶¶ 59, 60.) But by its terms § 4906 concerns only the express or actual termination or cancellation of, or failure to renew, a franchise. "Effective termination" is a term nowhere defined by or found in § 4906 or any other MVFPA provision, and Nucar makes no credible argument to the contrary.

■■■ Of a similar piece is Nucar's claim that "Mazda's appointment of a new dealer in Nucar's market, and its failure to consider Nucar's proposal to relocate, constituted predatory and discriminatory conduct" in violation of § 4913. (Compt., ¶¶ 61, 62.) However, § 4913 does not purport to govern a manufacturer's right to appoint a new dealer, and Nucar has made no reasoned effort to demonstrate that Mazda's conduct falls within the scope or intended meaning of the statutory term "predatory practice or discrimination." The type of conduct contemplated by that phrase is the sacrificing of present revenue with the aim

of driving a competitor out of the market, expecting to recoup the losses through subsequent higher prices after the competition is eliminated. *See International Air Ind., Inc. v. American Excelsior Co.*, 5th Cir., 517 F.2d 714, 723 (1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Aurora Enterprises v. National Broadcasting Co.*, 9th Cir., 688 F.2d 689, 695 (1982). No such conduct is involved here, and Nucar has not shown that § 4913 has any different meaning or that its ambit is sufficiently broad to cover this dispute. In short, the conduct complained of here bears no resemblance to the type of conduct that § 4913 proscribes.

Accordingly, Nucar's complaint fails to state a cognizable claim under the MVFPA.

### V.

The crux of Nucar's grievance against Mazda, and the claim upon which Nucar places the greatest emphasis, is found in Count I, which alleges that Nucar breached the Dealer Agreement by:

(a) announcing its intention to appoint a new Mazda dealer within Nucar's exclusive approved area of operations;

(b) failing to deal in good faith with Nucar;

(c) failing to make any effort or to respond to Nucar's efforts to pursue the existence of "mutually agreeable alternatives" to the appointment of a new dealership; and

(d) failing to provide Nucar with adequate notice of its intention to appoint a dealer within Nucar's Approved Location.

In its brief, however, Nucar abandoned items (a) and (d), and now stakes its contract claim upon items (b) and (c). The reason is understandable: the Dealer Agreement does not give Nucar an exclusive sales territory in Newark or anywhere else—a fact that Nucar is forced to concede.[3] Absent such a right, Mazda is free to appoint new dealers outside of the statutory market area wherever it sees fit. *See BMW of North America, Inc. v. New Motor Veh. Bd.,* Cal.App., 209 Cal.Rptr. 50, 57, 209 Cal.Rptr. 50 (1984). Additionally, the record establishes that Mazda gave Nucar adequate notice of its intention to appoint a new dealer, and Nucar makes no satisfactory argument or evidentiary showing to the contrary.

Therefore, Nucar retreats to the position that all it seeks to enforce is Mazda's implied covenant of good faith and fair dealing. In its brief, Nucar contends that:

> Mazda had the contractual duties "to discuss whether there exist ... any mutually agreeable alternatives" to the appointment of another Mazda dealer in the Newark area and "in all circumstances" to resolve disputes "through good faith negotiations". Given these duties, it is obvious that had the parties focused on the specific subject of a proposal to relocate, they would have specifically agreed to act in good faith and fairly in resolving that issue.

(Nucar Ans. Br., at 12–13.)

Nucar then goes on to assert that:

> ... Nucar does not argue it is entitled to an exclusive franchise. All Nucar claims are the rights to negotiate an agreeable alternative in accordance with the Mazda/Nucar contract when a new dealer is proposed near Nucar's present location and the right to negotiate "all" other disputes with Mazda. That is what the contract says.

(*Id.* at 15.)

To evaluate these claims, it is necessary to place them in their proper context. Nucar having conceded that it has no exclusive sales territory, its two remaining contract claims implicate only one issue: whether Nucar has a contractual right to relocate. The Dealer Agreement confers no such right, and at oral argument Nucar's counsel conceded that Nucar does not

---

3. In this connection all that the Dealer Agreement provides is found in Paragraph 2, entitled "Area of Primary Sales Responsibility." That provision gives Nucar *"the non-exclusive right, subject to the provisions of this agreement, to* purchase from MAZDA for resale Mazda Vehicles and Parts and Accessories," and that Nucar's *"area of primary sales responsibility is ...* [t]hat area commonly known as the Wilmington, Delaware trading area." (Emphasis added.)

claim a contractual right to be relocated or a right of "first refusal" where (as here) Mazda seeks to create a new dealership outside the seven-mile relevant market area. (Oral Arg. Tr. at 40–41.) Accordingly, the contract "rights" that Nucar professes to be seeking to enforce—Mazda's obligations to "deal in good faith with Nucar" and to "pursue the existence of 'mutually agreeable alternatives' to the appointment of a new dealership" (Compt., ¶¶ 34(b), (c))—boil down to an effort to compel Mazda to negotiate with Nucar over an "entitlement" that Nucar does not have, concerning a subject as to which Mazda has no obligation to consent.

To put it differently, Nucar has no right to ask this Court to compel Mazda to permit it to relocate. Nonetheless, Nucar attempts to achieve indirectly what it cannot do directly, by seeking through this action (i) to compel Mazda to conduct good faith negotiations over whether Mazda should accede to Nucar's request to relocate, and (ii) to require that such negotiations take place before Mazda may exercise its undisputed right to appoint another dealer at the proposed Newark location.

The question comes down to this: do the contractual provisions that Nucar seeks to enforce in this fashion give rise to claims upon which relief can be granted? In my view, the answer must be no.

■ *First*, Nucar is seeking to metamorphose a proposed *remedy* (an order compelling the performance of an "obligation" to hold good faith discussions) into a substantive *right* that Nucar does not otherwise have (the right to relocate). Nucar attempts this first by arguing that Mazda has already breached its obligation to negotiate with Nucar by deciding to open a dealership in Newark without having first afforded Nucar an opportunity to show Mazda the error of its decision. (Oral Arg. Tr. at 49–50.) Nucar next argues that one potential remedy flowing from that breach is for the Court to "enforce the contract by requiring Mazda to agree to a proposal by Nucar [to relocate] if that's consistent with what Mazda would do in every other case." (*Id.* at 51.) Alterna-

tively, Nucar contends that the Court could order Mazda to sit down and negotiate in good faith. (*Id.*) If Mazda persists in denying Nucar's relocation request, these judicially-compelled negotiations would be followed by a hearing to determine if Mazda had violated the Court's order. If the Court found that Mazda had not negotiated in good faith, it would then order Mazda to permit Nucar to relocate to the Newark location. (*Id.* at 53–57.) Under either scenario, Nucar would obtain by way of a (circuitous) procedural remedy, a result (relocation) to which it has no substantive contract right or entitlement.

■ The powers of this Court may not be used in that fashion. Courts of equity cannot create new substantive rights under the guise of "doing equity." *Natovitz v. Bay Head Realty Co.*, N.J.Err. & App., 142 N.J.Eq. 456, 59 A.2d 423, 427 (1948). "[O]ne who invokes equity must demonstrate more than that he has been the victim of an asserted injury. The injury must be one which the law recognizes; that is, is recognizable in law." *Central Storage & Transfer Co. v. Kaplan*, 37 Pa. Cmwlth. 105, 389 A.2d 711, 715 (1978), *aff'd*, 487 Pa. 485, 410 A.2d 292 (1979). This Court's power to fashion appropriate remedies presupposes the existence of an enforceable right. If equity will not intervene where the legal right is doubtful, *Ginsberg v. Mascia*, Conn.Supr.Err., 149 Conn. 502, 182 A.2d 4, 5 (1962), *a fortiori* it should not intervene where, as here, the legal right is nonexistent.

■ *Second*, the underlying conceptual premise of Nucar's contract claim is flawed. Nucar predicates its entire claim upon the theory that Mazda has violated its implied duty to perform the Dealer Agreement in good faith. That such an implied duty is a recognized part of our Delaware jurisprudence is indisputable. *See Katz v. Oak Industries, Inc.*, Del.Ch., 508 A.2d 873, 880 (1986); *Wilgus v. Salt Pond Inv. Co.*, Del.Ch., 498 A.2d 151, 159 (1985); *Simons v. Cogan*, Del.Ch., 542 A.2d 785, 787 (1987), *aff'd*, Del.Supr., 549 A.2d 300 (1988). However, the duty arises only where it is clear from what the parties expressly

agreed, that they would have proscribed the challenged conduct as a breach of the implied covenant of good faith had they thought to negotiate with respect to the matter. *Katz*, 508 A.2d at 880.

It follows that where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play. *Williams Natural Gas Co. v. Amoco Production Co.*, Del.Ch., C.A. No. 11040, 1991 WL 58387, Jacobs, V.C., Mem.Op. at 19 (Apr. 16, 1991) (applying Kansas law); *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1143 (1990) ("Although an implied covenant of good faith exists in every contract . . . such subjective standards cannot override the literal terms of an agreement.") (applying New Jersey law, which the Court found to be consistent with general principles of contract law, *id.* at 1142 n. 26). For that reason no room exists to invoke the implied duty to perform in good faith here. The Dealer Agreement expressly provides that the Dealer shall conduct its operations at the "Approved Location," which is Nucar's New Castle location and the *only* location that is contractually permitted. The right to operate at any other location is a subject that falls wholly outside the scope of the Dealer Agreement. Thus, any request by Nucar to operate at a different location must be a subject of separate negotiations outside the framework of the Dealer Agreement. Accordingly, the relocation issue is not a dispute to which the Dealer Agreement's "good faith negotiation" provision would even apply.

*Third*, the specific language of the two contract provisions upon which Nucar relies makes it evident that those provisions, if violated, were not intended to give rise to an actionable claim of the kind advanced here.

The first of these provisions is activated only where Mazda ". . . determines . . . to appoint another dealer to . . . sell . . . MAZDA products near DEALER'S Approved Location. . . ." By its terms that provision does not apply to a dealer's re-

quest to relocate, and the only duty it imposes upon Mazda is to give Nucar at least sixty days' notice of the decision to appoint the new dealer, "for the purpose of enabling the parties to discuss whether there exist any mutually agreeable alternatives to the proposed action." Mazda did give Nucar such notice, and the parties did discuss alternatives, namely, relocation. That that alternative turned out not to be "mutually agreeable" does not give Nucar an enforceable claim.

The other provision Nucar seeks to enforce is found in the "Dispute Resolution" section of the Dealer Agreement, and applies to "disputes . . . involving matters affecting [the parties'] business relationship and performance under the MAZDA Dealer Agreement." The obligation that provision imposes (upon both parties) is to "seek prompt and expeditious non-judicial resolution of disputes between them through good faith negotiations, involving open, frank and constructive discussions having reference to the spirit, intents and purposes of the MAZDA Dealer Agreement." That language, fairly read, evidences that what the parties contemplated was a method of resolving disputes over *existing* rights and duties under the Dealer Agreement, not issues falling completely outside its scope.

But, more fundamentally, there is no evidence that the parties intended by this provision to create a specifically enforceable "duty to negotiate." The good-faith-negotiation provision, when considered in its entirety and in context, was intended basically as the first step of a more comprehensive procedural scheme and obligation—imposed upon both parties—"to seek prompt and expeditious non-judicial resolution of disputes between them." The highly detailed nonjudicial dispute resolution procedures spelled out in subsequent provisions of the "Dispute Resolution" section makes that intention manifest. That section prescribes a sequence of specific, detailed procedures, beginning with management review, progressing to a stipulation as to the facts and issues in dispute, moving to third-party resolution, and, finally, to binding

arbitration. Those procedures, and their sequence, make it evident that litigation was intended as a last resort, and not (as Nucar implicitly suggests) the beginning point, of the dispute resolution process. Indeed, to allow this action to proceed would stand on its head the very nonjudicial resolution mechanism that Nucar professes to be vindicating.

■ *Fourth,* and finally, to permit Nucar to enforce the Dealer Agreement in this fashion would be inequitable and do violence to the contracting parties' commercial expectations. The Dealer Agreement reflects the parties' bargain that Mazda would have a right, free of that Agreement's conditions and restrictions and in its sole discretion, to grant or deny dealer requests to relocate. For the Court now to fetter that bargained-for discretion retroactively, by forcing it into the Procrustean mold of a "duty to negotiate" procedure, and then making those forced negotiations the subject of a judicial hearing and possible contempt decree, would substantially impair the value of that bargain to Mazda. It would also effectively confer upon the dealer a veto power that neither party bargained for or intended.

Accordingly, the complaint fails to state cognizable claims for breach of the Dealer Agreement.[4]

\* \* \*

For the reasons discussed, the defendant's motion for summary judgment dismissing the complaint is granted. IT IS SO ORDERED.

---

**4.** That finding makes it unnecessary separately to address the plaintiff's claim for tortious interference with prospective contract relations. At oral argument Nucar's counsel stated that that claim derived from, and depended upon, Nucar's contract claim. (Oral Arg. Tr. at 66–67.) Moreover, in these circumstances a critical element of that claim, the "reasonable probability of a business opportunity" does not exist. *De-Bonaventura v. Nationwide Mutual Ins. Co.,* Del. Supr., 428 A.2d 1151, 1153 (1981).