**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

March 29, 2021

Peter B. Ladig, Esquire
Brett M. McCartney, Esquire
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801

Srinivas M. Raju, Esquire
Angela Lam, Esquire
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801

> RE: ***Deluxe Entertainment Services Inc. v. DLX Acquisition Corporation
> and Deluxe Media Inc.,***
> Civil Action No. 2020-0618-MTZ

Dear Counsel:

This letter opinion addresses the issues raised by Defendants' motion for judgment on the pleadings (the "Motion").[1] For the following reasons, the Motion is granted.

## I.     BACKGROUND

This action arises from a stock transfer whereby plaintiff Deluxe Entertainment Services, Inc. ("Plaintiff" or "Seller") sold all the outstanding shares

---

[1] Docket Item ("D.I.") 36. On this motion for judgment on the pleadings, I draw all facts from the pleadings and documents integral to them. Citations in the form "Compl. ¶ —" refer to the plaintiff's complaint, available at D.I. 1. Citations in the form "Answer ¶ —" refer to the defendants' answer to the complaint, available at D.I. 30. Citations in the form "Hr'g Tr." refer to the transcript of the December 11 oral argument on the Motion, available at D.I. 47.

of its wholly owned subsidiary, defendant Deluxe Media Inc. (together, with its subsidiaries, "Target"), to defendant DLX Acquisition Corporation ("Buyer," and together with Target, "Defendants"), an affiliate of the private equity firm Platinum Equity ("Platinum"). I refer to the stock transfer as the "Transaction." Before the Transaction, Seller was a leading "video creation to distribution" company, and Target was Seller's distribution subsidiary.[2] All of Target's assets, except for those excluded by the parties' purchase agreement (the "Purchase Agreement"),[3] were transferred in the Transaction.

The Transaction closed on June 30, 2020.[4] At closing, several million dollars in cash remained in Target's bank accounts (the "Disputed Cash").[5] Seller alleges it failed to sweep those funds from Target before closing "for various practical and

---

[2] *See* Compl. ¶¶ 1, 4, 6.

[3] Answer Ex. 1 [hereinafter "Purchase Agr."]; *see also* Answer Ex. 2. The Purchase Agreement's schedules are attached as Exhibit 2; for clarity, I cite both using "Purchase Agr."

[4] *See* Compl. ¶ 1.

[5] *See id.* The actual amount of cash in question is unclear. Seller's complaint suggests that the Disputed Cash was "over $9.1 million," which Defendants deny. *Compare id.*, *with* Answer ¶ 1. During briefing on the motion to expedite, Seller filed a declaration stating that the correct amount was $9.8 million. *See* D.I. 23. Seller's briefs on the Motion appear to reference the $9.8 million figure. *See, e.g.*, D.I. 41 at 1 ("almost $10 million"). The amount of the Disputed Cash is irrelevant to my analysis.

technical reasons,"[6] and Buyer does not dispute Seller had the right to sweep those funds before closing.[7]

Seller's controller first discovered the issue with the Disputed Cash on July 1.[8] Later that day, on a phone call with Platinum and its liquidity expert, Seller asked Buyer to return the Disputed Cash, citing "wrong pocket" provisions in the Purchase Agreement and the "cash-free nature of the deal."[9] Buyer refused, insisting that the Purchase Agreement did not compel it to return the Disputed Cash.[10] Over the next two weeks, Seller, its liquidity expert, and its financial advisor for the Transaction contacted representatives from Platinum and former Seller employees (now Buyer/Target employees), but could not secure the Disputed Cash's return.[11]

---

[6] Compl. ¶ 26.

[7] Buyer's counsel conceded at oral argument that Seller would have been within its rights to sweep the Disputed Cash, or at least some of it, from Target's bank account prior to closing. *See* Hr'g Tr. 9:9–10:2.

[8] *See* Compl. ¶ 26.

[9] *See id.* Around the same time, the parties had an ancillary dispute over Buyer's failure to properly fund its payroll and rent after closing. *See id.* ¶¶ 27–29. The parties have not otherwise referenced this dispute, and it does not appear to bear on Seller's claims in this action.

[10] *See id.* ¶ 1; Answer ¶ 1.

[11] *See* Comp. ¶¶ 29–31.

Conversations between Seller's general counsel and a Platinum representative on July 13 and July 22 were similarly fruitless.[12]

On July 24, Seller filed its verified complaint (the "Complaint") seeking, in effect, to claim or claw back the Disputed Cash.[13] Seller presents three alternative approaches. Count I alleges that Buyer's failure to return the Disputed Cash amounts to a breach of the Purchase Agreement.[14] Count II claims that that this failure is a breach of the implied covenant of good faith and fair dealing.[15] Count III asks the Court to reform the Purchase Agreement to address this issue.[16]

The Complaint was accompanied by a motion to expedite,[17] which the Court denied on August 10.[18] On August 18, Defendants filed their answer to the Complaint (the "Answer"), denying most of Seller's substantive allegations and attaching a copy of the Purchase Agreement.[19] On October 2, Defendants filed the

---

[12] *See id.* ¶¶ 32–33.

[13] *See generally id.*

[14] *See id.* ¶¶ 37–44.

[15] *See id.* ¶¶ 45–49.

[16] *See id.* ¶¶ 50–53.

[17] *See* D.I. 2.

[18] *See* D.I. 24.

[19] *See generally* Answer.

pending Motion, seeking judgment on the pleadings in their favor.[20] The parties

fully briefed the Motion, and the Court took it under advisement after oral argument

on December 11.[21]

## II. ANALYSIS

The standard for a motion for judgment on the pleadings is familiar.

> [A] trial court is required to view the facts pleaded and the inferences
> to be drawn from such facts in a light most favorable to the non-moving
> party. The court must take the well-pleaded facts alleged in the
> complaint as admitted. A motion for judgment on the pleadings may
> be granted only when no material issue of fact exists and the movant is
> entitled to judgment as a matter of law.[22]

The proper interpretation of a contract is a question of law, and so judgment on the

pleadings is a proper framework to enforce unambiguous contracts.[23]

---

[20] D.I. 36.

[21] *See* D.I. 46; *see generally* Hr'g Tr.

[22] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (citations omitted).

[23] *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006); *accord Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) ("[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact. . . . If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must grant judgment on the pleadings in favor of the moving party." (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005))).

The Purchase Agreement, while "heavily negotiated,"[24] is unremarkable in that it presumes all Company Assets are included in the Transaction unless specifically excluded. Seller makes no argument that the Purchase Agreement specifically excluded the Disputed Cash or made it subject to being clawed back. Rather, Seller argues the parties never intended to transfer the Disputed Cash to Buyer as evidenced by (1) the Purchase Agreement's definition of net working capital for purposes of calculating the purchase price, and (2) extrinsic evidence about the parties' negotiations leading up to the Purchase Agreement, which Seller contends reflects the parties' otherwise undocumented agreement that the Transaction would be "cash-free, debt-free." These arguments fail to demonstrate a breach of contract or the implied covenant, and fail to support a claim for reformation.

### A. Buyer Is Entitled To Judgment On Seller's Breach Of Contract Claim.

Count I of the Complaint alleges that Buyer breached the Purchase Agreement by either taking the Disputed Cash in the first instance, or by failing to remit it after the Transaction closed. At the pleading stage, a plaintiff alleging a breach of contract must plead (1) the existence of a contractual obligation, (2) a breach of that

---

[24] *See* Compl. ¶ 16.

obligation, and (3) damages as a result.[25]  In interpreting contracts, Delaware courts

aim to "give priority to the parties' intentions as reflected in the four corners of the

agreement, construing the agreement as a whole and giving effect to all its

provisions."[26]  "Delaware adheres to the objective theory of contracts, [meaning that]

a contract's construction should be that which would be understood by an objective,

reasonable third party."[27]   In doing so, the Court will "give effect to the plain-

meaning of the contract's terms and provisions,"[28] "will read a contract as a whole

and . . . will give each provision and term effect, so as not to render any part of the

contract mere surplusage."[29]  "Contract terms themselves will be controlling when

---

[25] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *see also Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006) ("Three elements are necessary to prove the existence of an enforceable contract:  1) the intent of the parties to be bound by it, 2) sufficiently definite terms and 3) consideration.").

[26] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)); *see Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("To determine what contractual parties intended, Delaware courts start with the text.").

[27] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal*, 2005 WL 1038997, at *5).

[28] *Id.* at 1159–60; *see also GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) ("When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions.").

[29] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[30]

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning," without resorting to extrinsic evidence.[31] Extrinsic evidence cannot itself create ambiguity: "[e]xtrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[32]

"Under basic principles of Delaware contract law, and consistent with Delaware's pro-contractarian policy, a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."[33] Delaware law presumes parties are bound by the language of the agreement they negotiated,

---

[30] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[31] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[32] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007); *see also Eagle Indus., Inc.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[33] *GRT, Inc.*, 2012 WL 2356489, at *7.

especially where, as here, the parties are sophisticated entities that have engaged in arms-length negotiations.[34]

### 1. The Purchase Agreement Transfers All Target Assets Except Certain Excluded Assets, Which Do Not Encompass The Disputed Cash.

Under the Purchase Agreement's terms, Seller agreed "to sell and assign to Buyer, and for Buyer to purchase and pay for" all of Target's shares (the "Target Shares") in exchange for a cash payment.[35] In other words, Seller sold Target to Buyer by transferring all Target Shares to Buyer.[36] "[I]t is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock."[37] When Seller agreed to sell Buyer all the Target Shares,

---

[34] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 391 (Del. 2009); *see also id.* at *9 n.82 (noting that the parties were "sophisticated" because they had "extensive experience" in the industry and "ample access to counsel").

[35] *See* Purchase Agr. at 5.

[36] *See id.* § 2.1.

[37] *In re KB Toys Inc.*, 340 B.R. 726, 728 (D. Del. 2006); *see US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *6 (Del. Ch. June 18, 2018) (citing *KB Toys Inc.*, 340 B.R. at 728), *aff'd*, 202 A.3d 510 (Del. 2019); *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 99 (Del. Ch. 2009) ("The familiar default rule in stock sales is that a change in the ownership of a company does not affect the rights and liabilities of the company." (citing *KB Toys Inc.*, 340 B.R. at 728)).

it agreed to sell all the Target's assets.[38]  Thus, by default, Target's pre-closing assets and liabilities transferred with its shares.[39]

In keeping with this default principle, the parties did not enumerate the assets Buyer was purchasing, but rather negotiated provisions that carved certain assets and liabilities out of the Transaction, and provided means for returning those assets if they were inadvertently transferred.  Section 1.2 of the Purchase Agreement defines

---

[38] The Purchase Agreement defined the Target's "Company Assets":

> "**Company Assets**" means all assets, properties or rights of any kind or nature of any member of the Company Group or solely or primarily used by the Company Group in the conduct of its business (i) including the Deluxe name and brand and all other company names and brands used by the Company Group, and (ii) excluding, for the avoidance of doubt, assets, properties or rights transferred out of the Company Group pursuant to the Restructuring.

Purchase Agr. § 1.2 (defining "Company Assets").  The Purchase Agreement refers to the Target as the "Company," and its subsidiaries as the "Company Group."  *See id.* at 5; *id.* § 1.2 (defining "Company Group").  Thus, by its plain meaning, "all assets . . . of any kind or nature of any member of the Company Group" includes the Disputed Cash, owned by the Target.  *See id.* § 1.2 (defining "Company Assets").

[39] *See KB Toys Inc.*, 340 B.R. at 728; *US Ecology, Inc.*, 2018 WL 3025418, at *6; *Viking Pump, Inc.*, 2 A.3d at 99.

"Excluded Assets" as those listed in Schedule 1.2.[40] Seller does not advance any argument that the Disputed Cash is an Excluded Asset.[41]

The Purchase Agreement includes two "wrong pocket" provisions to correct certain erroneous transfers after closing (the "Wrong Pocket Provision(s)"). While Seller makes passing reference to the Wrong Pocket Provisions,[42] it does not offer any explanation as to why they would compel Buyer to return the Disputed Cash. Neither Wrong Pocket Provision applies to the Disputed Cash.

---

[40] Purchase Agr. § 1.2 (defining "Excluded Assets"). That Schedule enumerates:

1. All assets, operations and Intellectual Property solely or primarily used to provide the Excluded Businesses.
2. Any amounts payable by the landlord of the Wardour Street Lease to Deluxe 142 Limited ("**Deluxe 142**"), as described further in Item 1 on Schedule 4.9(c).
3. All amounts payable by NASG to the Company or Parent in connection with the sale of the business unit known as "Deluxe Archive Solutions", as described further in Item 6 on Schedule 4.7(b).

*See id.* Sched. 1.2.

[41] *See* D.I. 41 at 22 (acknowledging "the Target's pre-closing cash is not included in Schedule 1.2 of the Purchase Agreement, which identifies the Excluded Assets in the transaction (the 'Excluded Asset Schedule')"). Indeed, there appears to be no connection between the Disputed Cash and any of the categories of Excluded Assets.

[42] *See id.* at 13 ("Plaintiff's controller promptly requested this cash from Platinum (as it was entitled to do under the Purchase Agreement's 'wrong pocket' provision) on and after July 1, 2020, when Plaintiff's controller first discovered that the Buyer and Target were treating the cash that was in the Target at closing as if it belonged to Buyer."). This statement also appears in the Complaint. *See* Compl. ¶ 26; *see also id.* ¶ 1.

One Wrong Pocket Provision applies to payments Target received from any customer or other counterparty "to the extent that such payment constitutes an Excluded Asset."[43] As explained, Seller does not allege and cannot argue that the Disputed Cash is an Excluded Asset.

The other Wrong Pocket Provision addresses assets "solely or primarily related to the Designated Services, the Excluded Business or any obligation, liability or commitment not forming part of the Company Liabilities."[44] If one of these assets has been "transferred to a member of the Company Group [Target] in error," Buyer must remit it to the Seller.[45] Seller does not allege or argue that the Disputed Cash related to any of the Designated Services,[46] the Excluded Business,[47] or otherwise

---

[43] *See* Purchase Agr. § 6.14(c).

[44] *See id.* § 6.14(b).

[45] *See id.*

[46] *See id.* § 1.2 (defining "Designated Services" to include certain "services of Parent and its Subsidiaries (excluding the Company Group [Target])"). There is no allegation that Disputed Cash belonged to the Parent before closing and, in fact, allegedly was in the Target's accounts prior to closing. *See* Compl. ¶ 1 ("When the [Transaction] closed . . . certain of the Target's subsidiaries had cash in them that had not been swept from certain accounts before closing.").

[47] *See* Purchase Agr. § 1.2 (defining "Excluded Business" to include, *inter alia*, business or operations within certain clauses in the definition of "Designated Services," or those related to the provision of certain creative services).

was outside of the Company Liabilities,[48] as those terms are defined. The Complaint does not specify what the Disputed Cash relates to, and fails to connect it in any way to a Wrong Pocket Provision.[49]

Thus, the Purchase Agreement presumes all Company Assets are included in the Transaction unless specifically excluded. Seller makes no argument that the Disputed Cash was in any way excluded or subject to being clawed back. Seller does not contend that any of these provisions of the Purchase Agreement were breached.

> **2.      The Purchase Agreement's Definition Of Net Working Capital, As Negotiated, Pertains To Calculating The Purchase Price, Not Identifying Assets As Transferred Or Excluded.**

Against this unambiguous and essentially undisputed backdrop, Seller argues the Purchase Agreement does not transfer Target's cash to Buyer based on the Purchase Agreement's calculation of the purchase price, which directs a calculation

---

[48] *See id.* (defining "Company Liabilities" to include "all Liabilities of any member of the Company Group [Target]," with certain exceptions).

[49] *See* Compl. ¶¶ 1, 26.

of net working capital that excludes cash.  The Purchase Agreement set the purchase

price according to the definition of "Closing Date Purchase Price."[50]

> "**Closing Date Purchase Price**" means (a) one hundred ninety-five million dollars ($195,000,000); plus (b) the difference of (which amount may be a positive or negative number) (i) estimated Net Working Capital as set forth in the Purchase Price Certificate minus (ii) Target Net Working Capital; minus (c) the Closing Date Indebtedness; minus (d) the Adjustment Escrow Amount; minus (e) the Indemnity Escrow Amount; minus (f) an amount equal to all unpaid Transaction Bonuses; minus (g); the Indian Business Transfer Holdback Amount; minus (h) accrued but unpaid income Taxes which amount is deemed to be $500,000.[51]

In turn, the definition of "Net Working Capital" reflects the parties' agreement that

cash would be excluded from that calculation:

---

[50] *See* Purchase Agr. § 2.1.  Seller does not specify the actual final purchase price but does not allege that Buyer did not satisfy its obligation to pay.

[51] *See id.* § 1.2 (defining "Closing Date Purchase Price").

> "**Net Working Capital**" means, as of 12:01 a.m. New York City time on the Closing Date, (a) the sum of the current assets of the Company Group set forth on the line items and subject to the adjustments set forth on Schedule 2.4; minus (b) the sum of the current liabilities of the Company Group set forth on the line items and subject to the adjustments set forth on Schedule 2.4 (which schedule shall not include any Transaction Bonuses), in each case, calculated in accordance with the Accounting Principles. An illustrative example of the calculation of Net Working Capital is set forth on Schedule 2.4. For purposes of the calculation of "New Working Capital", current liabilities shall include all deferred rent (including the portion of any Security Deposit applied toward the payment of any rent or any other amount due under any applicable Real Property Lease which has not been replenished as of the Closing, including those set forth on Schedule 4.9(b)(ii)), deferred vendor payments, any other deferred payments, and related penalties, and all accrued and unpaid non-income taxes as of the Closing, including any accrued and unpaid non-income Taxes arising in connection with the Restructuring transactions.[52]

The "illustrative example of Net Working Capital . . . set forth on Schedule 2.4" excludes cash as a "definitional adjustment."[53]

In the days before closing, as required by the Purchase Agreement,[54] Seller delivered its "Purchase Price Certificate" with a Net Working Capital worksheet that, as agreed, excluded cash.[55]

---

[52] *See id.* (defining "Net Working Capital").

[53] *See id.* Sched. 2.4.

[54] *See id.* § 1.2 (defining "Purchase Price Certificate"); *see also id.* § 2.3(a)(vi).

[55] *See* Compl. ¶ 24.

Seller argues that the Purchase Agreement's exclusion of cash from Net Working Capital, and thus from the Closing Date Purchase Price, indicates the parties' clear intent that the Transaction would be "cash-free, debt-free."[56] Seller asks too much of these provisions: they simply exclude cash from the calculation of the final purchase price. The definition of Net Working Capital excludes cash from the calculation of Net Working Capital as a "definitional adjustment" for purposes of calculating the Closing Date Purchase Price.[57] The purchase price adjustments are just that: adjustments to how much Buyer paid, not to what assets the Buyer purchased. Nothing in these purchase price provisions indicate the parties' intention to exclude cash, or any of the other adjustments to Net Working Capital, from the assets transferred by the Transaction.[58]

---

[56] *See id.* ¶ 39 ("Under the plain language of the Purchase Agreement, cash was excluded from the calculation of Net Working Capital which reflects the parties' meeting of the minds that cash was not an asset that was being transferred to Buyer under the Purchase Agreement.").

[57] *See* Purchase Agr. § 1.2 (defining "Net Working Capital" and "Closing Date Purchase Price"); *id.* Sched. 2.4.

[58] Other assets and liabilities excluded from the calculation of Net Working Capital include "Short Term Debt," "Accrued Interest," "Earn Out Payable," "Accrued Taxes," "Intercompany & Related Parties," and "Deferred Rent." *See id.* None of these assets or liabilities are listed in the "Excluded Assets, Excluded Liabilities" schedule in the Purchase Agreement. *Compare id.*, *with id.* Sched. 1.2.

Had the parties intended to do so, they could have easily drafted a provision stating that assets excluded from the calculation of Net Working Capital are not transferred. Indeed, the Excluded Assets provision makes clear the parties knew how to exclude assets from the Transaction. In the face of the Purchase Agreement's plain terms, "an objective, reasonable third party" would not understand the example Net Working Capital calculation in Schedule 2.4 to exclude cash from the Transaction.[59] Torturing this provision to alter the scope of the Transaction would rewrite the parties' "heavily negotiated"[60] bargain and secure for Seller "a contractual right that it did not obtain for itself at the negotiating table."[61]

Seller has contended that "at worst," the Purchase Agreement is ambiguous in its treatment of cash, so the Court may reach its proffered extrinsic evidence and conclude the parties intended the Transaction to exclude cash.[62] But the Purchase Agreement is not ambiguous on this point, so I do not reach Seller's arguments about the parties' negotiation history. Nor can this negotiation history itself create ambiguity, as "[e]xtrinsic, parol evidence cannot be used to manufacture an

---

[59] *See Osborn*, 991 A.2d at 1159 (quoting *NBC Universal*, 2005 WL 1038997, at *5).

[60] *See* Compl. ¶ 16.

[61] *See GRT, Inc.*, 2012 WL 2356489, at *7.

[62] *See* Compl. ¶ 40.

ambiguity in a contract that facially has only one reasonable meaning."[63] Extrinsic evidence about the parties' negotiations—over the definition of Net Working Capital or otherwise—cannot alter the conclusion that the Purchase Agreement transferred all of Target's assets to Buyer.[64]

The Motion is granted with respect to Count I.

### B. Buyer Is Entitled To Judgment On Seller's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

In Count II, Seller argues that the implied covenant of good faith and fair dealing requires Buyer to return the Disputed Cash. Having failed to identify a gap in which the implied covenant could operate, Seller's claim fails.

---

[63] *United Rentals, Inc.*, 937 A.2d at 830; *see also Eagle Indus.*, 702 A.2d at 1232.

[64] Count I alleges a breach of the Purchase Agreement, not the breach of any other agreement between the parties. *See* Compl. ¶¶ 37–44. To the extent Seller argues that Buyer breached a separate agreement that the Transaction would be "cash-free, debt-free," this argument also fails. By its plain terms, the Purchase Agreement supersedes the parties' prior agreements and understandings:

> This Agreement together with the Services Agreement, the Escrow Agreement, the Confidentiality Agreement and any annexes, exhibits and schedules to any of the foregoing constitute the entire agreement by and among the parties and their respective Affiliates relating to the Transactions and supersede any and all prior agreements, understandings, negotiations and communications, whether oral or written, that may have been made or entered into by or among any of the parties or any of their respective Affiliates relating to the Transactions.

Purchase Agr. § 11.5. Seller's reformation arguments are addressed *infra*.

"The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[65] "[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare,"[66] especially "when the contract easily could have been drafted to expressly provide for it."[67] "It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter."[68] The implied covenant "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents."[69]

---

[65] *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 888 (internal quotation marks omitted).

[66] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006).

[67] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

[68] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (alterations and internal quotation marks omitted) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[69] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (alterations and internal quotation marks omitted) (quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

"To state a claim for breach of the implied covenant, the [p]laintiff[] must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[70]  An essential predicate for the application of the implied covenant is the existence of a "gap" in the relevant agreement.[71]  There is no gap in which the implied covenant can operate "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject."[72]

Such is the case here.  The parties contemplated the possibility that an asset could be inadvertently transferred at closing, and drafted the Wrong Pocket Provisions to address that possibility.  An unintended asset transfer is not an

---

[70] *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *9 (Del. Ch. Mar. 28, 2013) (internal quotation marks omitted) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[71] *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015); *see also Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013) ("The implied covenant provides a limited gap-filling tool that allows a court to impose contractual terms to which the parties would have agreed had they anticipated a situation they failed to [address]."); *Dunlap*, 878 A.2d at 441 (noting that the implied covenant is "employed to analyze unanticipated developments or to fill gaps in [a] contract's provisions").

[72] *See Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd*, 609 A.2d 668 (Del. 1992).

"unanticipated development,"[73] but rather is "expressly covered by the contract."[74] As in *US Ecology, Inc. v. Allstate Power Vac, Inc.*, "the parties to the Purchase Agreement anticipated that there were circumstances under which [Buyer] would be obliged to [return certain wrongfully transferred assets],"[75] and "included an explicit provision obligating"[76] Buyer to do so. "They chose not to [include such a provision], however, with respect to the [Disputed Cash]."[77] To use the implied covenant to add the Disputed Cash to the list of Excluded Assets would be "to create a free-floating duty unattached to the underlying legal documents."[78]

The Motion is granted with respect to Count II.

### C. Buyer Is Entitled To Judgment On Seller's Reformation Claim.

In Count III, Seller contends that if the Purchase Agreement's plain language does not evidence the parties' agreement that the Disputed Cash was to be excluded

---

[73] *See Dunlap*, 878 A.2d at 441.

[74] *See Mazda*, 622 A.2d at 23.

[75] *See US Ecology, Inc.*, 2018 WL 3025418, at *7.

[76] *See id.* at *6.

[77] *See id.* at *7.

[78] *See Dunlap*, 878 A.2d at 441 (alterations and internal quotation marks omitted) (quoting *Glenfed Fin. Corp.*, 647 A.2d at 858).

from the Transaction, then the absence of such language is the result of a scrivener's error. Seller urges the Court to reform the Purchase Agreement.

"Generally, reformation is appropriate when an agreement has been made . . . but in reducing such agreement or transaction to writing . . . the written instrument fails to express the real agreement or transaction."[79] As Chancellor Bouchard has explained:

> Reformation is not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement.[80]

"[A] party seeking reformation by definition admits that had he read the document more carefully, he would have noticed and corrected the mistake."[81]

There are two principal bases for a claim for reformation: mutual mistake and unilateral mistake.[82] "[S]uch mistake must be as to a fact which enters into, and

---

[79] *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990) (alterations omitted) (quoting *Douglas v. Thrasher*, 489 A.2d 422, 426 (Del. 1985)).

[80] *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015).

[81] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 681 (Del. 2013).

[82] *See Great-W. Inv'rs LP v. Thomas H. Lee Pr's, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011).

forms the very basis of, the contract; it must be of the essence of the agreement, the *sine qua non* or, as it is sometimes expressed, the efficient cause of the agreement."[83] Critically here, the relevant mistake must be one of expression, that is, "one that relates to the contents or effect of the writing that is intended to express [the parties'] agreement."[84] Reformation based on mistake "must be applied narrowly so as to ensure to contracting parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract."[85]

At the pleading stage, a claim for reformation based on a mutual mistake will survive a motion to dismiss under Court of Chancery Rule 12(b)(6) only if it alleges: "(i) that the parties reached a definite agreement before executing the final contract; (ii) that the final contract failed to incorporate the terms of the agreement; (iii) that the parties' mutually mistaken belief reflected the true parties' true agreement; and

---

[83] *Liberto v. Bensinger*, 1999 WL 1313662, at *12 (Del. Ch. Dec. 28, 1999) (quoting *Fed. Land Bank of Balt. v. Pusey*, 1986 WL 9041, at *3 (Del. Super. Ct. July 21, 1986)).

[84] Restatement (Second) of Contracts § 155 cmt. a (1981); *see id.* cmt. b ("If . . . the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court will not reform a writing to reflect the agreement that it thinks they would have made."); *see also Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 n.40 (Del. 2002) (citing Restatement (Second) of Contracts § 155 cmt. a).

[85] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *15 (Del. Ch. June 30, 2004).

(iv) the precise mistake the parties made."[86] Similarly, a claim for unilateral mistake requires that a plaintiff "show that the parties had come to a definite agreement that differed materially from the written agreement,"[87] and "that despite the existing written agreement one party maintains is accurate, that existing writing erroneously expresses the parties' true agreement."[88] In either instance, the plaintiff must allege the parties reached a definite agreement that differed materially from the agreement they ultimately put into writing.[89]

A plaintiff must plead mistake with particularity: Court of Chancery Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[90]

---

[86] *Great-W. Inv'rs LP*, 2011 WL 284992, at *11.

[87] *Id.*

[88] *Scion Breckenridge*, 68 A.3d at 680.

[89] *See Great-W. Inv'rs LP*, 2011 WL 284992, at *11.

[90] Ct. Ch. R. 9(b).

> Thus, a complaint for reformation based on mutual mistake will withstand a motion to dismiss for failure to comply with the requirements of Rule 9(b), if it alleges: "(i) the terms of an oral agreement between the parties; (ii) the execution of a written agreement that was intended, but failed, to incorporate those terms; and (iii) the parties' mutual—but mistaken—belief that the writing reflected their true agreement and (iv) the precise mistake."[91]

At the same time, the prior understanding "need not constitute a complete contract in and of itself."[92]

Seller's allegations about the parties' negotiation history fail to plead the terms of a definite agreement that is materially different from the Purchase Agreement and that the parties intended to incorporate into the Purchase Agreement. And the mistake that has led to the perhaps unintended transfer of the Disputed Cash is not the sort of mistake that supports reformation; it is not a mistake in the expression of the Purchase Agreement, but rather an operational mistake by Seller in preparing to perform.

---

[91] *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *10 (Del. Ch. Dec. 7, 2012) (quoting *Joyce v. RCN Corp.*, 2003 WL 21517864, at *4 (Del. Ch. July 1, 2003)).

[92] *Cerberus*, 794 A.2d at 1152.

### 1.     The Parties' Negotiation History

In November 2019, after emerging from bankruptcy, Seller began the process of selling Target.[93]  Seller retained Moelis & Company LLC ("Moelis") to run the sale process.[94]  Moelis prepared an informational memorandum and an earnings report, and sent potential buyers who expressed an interest a letter dated February 10, 2020 (the "Initial Process Letter").[95]  The Initial Process Letter invited potential buyers to submit an indication of interest by March 5, and requested that it "indic[ate] the cash purchase price in U.S. dollars you are proposing to pay for 100% of [Target] on a cash-free, debt-free basis (the 'Enterprise Value')."[96]  On March 5, Platinum submitted such an indication (the "Initial IOI").[97]  The Initial IOI included an estimate of Target's "enterprise value" between $120 and $150 million.[98]

On May 1, Moelis sent a second process letter (the "Second Round Process Letter"), which similarly solicited proposals to acquire Target "on a cash-free, debt-

---

[93] *See* Compl. ¶ 9.

[94] *See id.*

[95] *See id.*

[96] *Id.*; *see also* Answer ¶ 9.

[97] *See* Compl. ¶ 10.

[98] *See id.*  The Complaint indicates that "enterprise value" was set forth in lower case in the Initial IOI.  *See id.*

free basis (the 'Enterprise Value').")[99] The Second Round Process Letter also invited potential buyers to review an online data room.[100] Buyer and Seller then proceeded to trade various due diligence documents in a due diligence tracker.[101] The May 13 version of that tracker showed that Seller rejected certain due diligence requests regarding Target's "borrowing base certificates" "because the transaction was a 'cash free/debt free deal.'"[102] Platinum did not object to Seller's response.[103]

On May 22, Platinum submitted a second indication of interest (the "Second IOI") that estimated Target's enterprise value as $175 million.[104] In response, Seller informed Platinum that it needed to receive "net value" of no less than $175 million, after giving effect to a net working capital adjustment at closing.[105] The parties discussed a $30 million net working capital goal, with the expectation that, at closing, net working capital would be around $10 million.[106] The parties ultimately

---

[99] *Id.* ¶ 11.

[100] *See id.* ¶ 12.

[101] *See id.* ¶¶ 12–13.

[102] *Id.* ¶ 13.

[103] *See id.*

[104] *See id.* ¶ 14.

[105] *See id.* ¶ 15.

[106] *See id.*

settled on a $195 million enterprise value, anticipating that net working capital adjustments would lead to a cash purchase price of $175 million.[107]

Throughout their negotiations, the parties consistently agreed to exclude the Target's cash from calculations of Target's net working capital. On May 12, Moelis added an example of a net working capital calculation to the virtual data room.[108] Around this time, Moelis and Platinum held a three-hour phone call to discuss net working capital, during which "Platinum agreed with excluding cash from the Net Working Capital calculation."[109] The parties also exchanged several documents addressing net working capital in advance of closing. On June 9, a Platinum representative sent Moelis a spreadsheet Platinum prepared entitled "AM – Project Rocket – Supporting Schedules_6.4.20.xlsx."[110] This spreadsheet deducted cash from the "Reported Net Working Capital" as a "Definitional Adjustment" to calculate "Definitional Net Working Capital."[111]

---

[107] *See id.*

[108] *See id.* ¶ 12.

[109] *Id.*

[110] *Id.* ¶ 16.

[111] *Id.*

On June 25, Moelis emailed Platinum's counsel a projected closing balance sheet for Target and a projected net working capital calculation.[112] The projected net working capital calculation continued to exclude cash as a Definitional Adjustment.[113] The balance sheet also indicated Target would have no cash at closing.[114] Platinum sent Moelis another net working capital spreadsheet on June 28, which continued to exclude cash from that calculation.[115]

The parties continued to communicate in the days leading up to the closing. Around June 26 or 27, Platinum requested certain "must-have" information from Seller regarding its funding needs post-closing, including a cash flow forecast.[116] In response, on June 28, Seller's liquidity consultant sent Platinum and its liquidity consultant several documents showing Target's starting cash balance as zero.[117] The Transaction closed on June 30.[118]

---

[112] *See id.* ¶ 17.

[113] *See id.*

[114] *See id.*

[115] *See id.* ¶ 21.

[116] *See id.* ¶ 18.

[117] *See id.* ¶ 19.

[118] *See id.* ¶ 1.

### 2. Seller Has Not Pled A Mistake For Which Reformation Is Available.

Seller's allegations fall well short of pleading an actionable mistake for the purposes of a reformation claim.

Seller principally contends the parties had an agreement that cash would be excluded from the calculation of net working capital.[119] But this agreement is reflected in the Purchase Agreement: it does not "differ[] materially" from the terms of the Purchase Agreement, as required for reformation.[120] And as explained, I have considered and rejected Seller's argument that the agreement to exclude cash from the price calculation evidences an agreement to exclude the Disputed Cash as a transferred asset. The fact that the parties agreed to exclude cash from the net working capital calculations early on in their negotiations does not change that conclusion.

Seller also contends that pre-close negotiations reveal the parties intended for the transaction to be "cash-free, debt free," such that they did not intend to transfer cash to Buyer. These negotiations fail to amount to a definite agreement. The back-

---

[119] *See* D.I. 41 at 31 ("The Complaint pleads with particularity the negotiation process whereby the parties agreed to the 'cash-free, debt-free' transaction structure, specifically the calculation of Net Working Capital, which excludes the Target's pre-closing cash from its calculus." (citing Compl. ¶¶ 15–17, 21)).

[120] *See Scion Breckenridge*, 68 A.3d at 680.

and-forth about Target's "Enterprise Value" in the Initial Process Letter, the Initial IOI, and the Second Round Process Letter does not evidence an agreement that the Disputed Cash was excluded from the assets sold in the Transaction. Seller's use of the phrase "cash-free, debt-free" in those communications is specifically about the Target's valuation.[121] Any agreement the parties reached via those communications concerned how to value Target, not what assets would ultimately transfer at closing.

Seller also alleges that it indicated Target would not hold any cash via the June 25 projected balance sheet and June 28 projected cash flow it shared with Platinum.[122] Seller's unilateral documents cannot stand in for a definite agreement between the parties. The Complaint merely alleges that Seller sent documents and that Buyer did not object to them.[123] It would be unreasonable to infer from Buyer's silence in response to Seller's documents that the parties struck a "definite agreement" that cash was not to be transferred in the Transaction.[124] Seller fails to

---

[121] *See, e.g.*, Compl. ¶ 9.

[122] *See id.* ¶¶ 17, 19.

[123] *See id.* ¶¶ 17, 19–20.

[124] *Compare id.*, *with Great-W. Inv'rs LP*, 2011 WL 284992, at *11 (recounting allegations in which one party informed the counterparty of the first party's belief of what the contract meant, and the counterparty agreed to that meaning and that the "wording should be modified to convey that meaning expressly"), *and Duff*, 2012 WL 6096586, at *10 (recounting allegations of conversations between both parties that could support a reasonable inference of a common understanding). *See also Envo, Inc. v. Walters*, 2009 WL 5173807, at *5 (Del. Ch. Dec. 30, 2009) ("This is not the type of error one would

allege the parties struck an agreement that cash would be excluded from the Transaction. Without such an allegation, there can be no claim for reformation.[125]

More fundamentally, Seller offers no evidence of a scrivener's error in the Purchase Agreement. Seller "does not identify what error was made when reducing [the Purchase Agreement] to writing,"[126] nor any mistake as to the "contents or effect of a writing that expresses the agreement."[127] Nor does Seller identify an erroneous belief "relat[ing] to the facts as they exist[ed] at the time of the making of the contract." [128]

Rather, the "mistake" at issue was Seller's failure to sweep the Disputed Cash from Target's bank account, separate and apart from the terms of the Purchase

---

expect business parties to miss. Indeed, to credit [plaintiff's] claim, the Court would have to draw unreasonable inferences from the facts alleged, which is not permitted on a motion to dismiss."), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE).

[125] *See Great-W. Inv'rs LP*, 2011 WL 284992, at *11; *Scion Breckenridge*, 68 A.3d at 680.

[126] *See Richard B. Gamberg 2007 Family Tr. v. United Rest. Gp., L.P.*, 2018 WL 566417, at *6 (Del. Ch. Jan. 26, 2018) (alterations and internal quotation marks omitted) (quoting *Lions Gate Ent. Corp. v. Image Ent. Inc.*, 2006 WL 1668051, at *8 (Del. Ch. June 5, 2006)).

[127] Restatement (Second) of Contracts § 151 cmt. a.

[128] *Id.* ("In this Restatement the word 'mistake' is used to refer to an erroneous belief. A party's erroneous belief is therefore said to be a "mistake" of that party . . . . [T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here. An erroneous belief as to the contents or effect of a writing that expresses the agreement is, however, a mistake.").

Agreement. Seller's failure to sweep Target's cash is an operations or accounting mistake, which is crucially distinguishable from a scrivener's error in the underlying agreement itself that can be remedied by reformation.[129] Seller's mistake in its own preparation to perform the parties' accurate agreement cannot justify reforming that agreement.[130] Seller bears the risk of that mistake.[131] The Court will not change the terms of the parties' bargain to accommodate Seller's error in preparing to perform under the agreement that reflects that bargain.

The Motion is granted with respect to Count III.

---

[129] *Cf. In re Estate & Tr. of Kalil*, 2018 WL 793718, at *8–10 (Del. Ch. Feb. 7, 2018) (MASTER'S REPORT) (declining to reform a trust on the basis of a mistake, when the mistake in question was Settlor's mistake in titling assets in an account, not in drafting the terms of the trust; and noting, "Settlor's mistake was in titling the Account, and that because that mistake did not affect the expression, inclusion or omission of specific terms in the [] Trust—but rather, affects only the title of the Account—reformation is not appropriate . . . . There was no scrivener's error—the Trusts' language expresses the Settlor's intent. Settlor's failure to retitle the Account is not a mistake in expression for which reformation is available."), *exceptions overruled and report adopted by* 2018 WL 11028294 (Del. Ch. June 11, 2018), *aff'd sub nom. Kalil v. Kalil*, 2021 WL 252837 (Del. Jan. 22, 2021) (TABLE).

[130] *See* Restatement (Second) of Contracts § 155 cmt. b & illus. 4–5.

[131] *See id.* § 154 cmt. a ("For example, it is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange of performances is material. In such a case a court will ordinarily allocate the risk of the mistake to the seller, so that he is under a duty to perform regardless of the mistake.").

## III. CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**. To the extent an order

is required to implement this conclusion, **IT IS SO ORDERED.**


Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor


MTZ/ms