**In re SUNSTATES CORPORATION SHAREHOLDER LITIGATION.**

**C.A. No. 13284.**

Court of Chancery of Delaware,
New Castle County.

Submitted: April 27, 2001.
Decided: May 2, 2001.

Carmella P. Keener, Esquire, Rosenthal Monhait Gross & Goddess, P.A., Wilmington, Delaware; Robert D. Goldberg, Esquire, Biggs & Battaglia, Wilmington, Delaware; H. Adam Prussin, Esquire, Pomerantz Haudek Block Grossman & Gross LLP, New York, New York, Attorneys for Plaintiffs.

Stephen E. Jenkins, Esquire, Richard D. Heins, Esquire, Ashby & Geddes, Wilmington, Delaware; Attorneys for All Defendants.

Sheldon Karon, Esquire, Larry Selander, Esquire, Thomas Krebs, Esquire, Jeffrey A. Soble, Esquire, Foley & Lardner, Chicago, Illinois; Attorneys for Clyde M. Engle and Howard Friedman.

Gerald M. Tierney, Jr., Esquire, Lincolnwood, Illinois, Attorneys for Defendants Hickory Furniture Company, Telco Capital Corporation, Harold Sampson, Robert J. Spiller, and Lee Mortenson.

*OPINION*

LAMB, Vice Chancellor.

### I.

Count II of the Amended Complaint is brought as a class action on behalf of the owner of shares of Sunstates Corporation $3.75 Preferred Stock. The complaint alleges that, between 1991 and 1993, and in violation of its certificate of incorporation, Sunstates purchased shares of its common and Preferred Stock when it was in arrears on the Preferred Stock dividend.

The defendants have moved for summary judgment on this claim. They concede the existence of the special limitation in the charter. But they deny its applicability because, as a matter of fact, Sunstates, itself, made no share repurchases. Rather, all reacquired shares were purchased by one or more of Sunstates's subsidiary corporations. Because the Sunstates certificate does not prohibit (although it might have) share repurchases by subsidiaries when the parent is in arrears on its Preferred Stock dividend, defendants argue that they are entitled to judgment in their favor as a matter of law.

Plaintiffs respond that it would render the protective provision of the charter nugatory and illusory if I interpreted it literally to apply only to share repurchases by the corporation itself, since the limitation could so easily be avoided. In a similar vein, they argue that the doctrine of good faith and fair dealing in contracts requires that I interpret the special limitation more broadly to reach the activity of Sunstates's subsidiaries. Finally, they suggest that I should ignore the separate corporate existence of the subsidiaries and treat them as mere agents of the parent corporation for this purpose.

The clause at issue clearly and unambiguously applies the special limitation against share repurchases only to Sunstates and not to its subsidiary entities. Construing that clause strictly, as I must, and recognizing that "nothing should be presumed in [its] favor," [1] it would be impermissible for me to find that the limitation also governs actions by Sunstates's subsidiaries. The result may be, as plaintiffs argue, that Sunstates was able to avoid the restriction by the simple means

---

1. *Waggoner v. Laster,* Del.Supr., 581 A.2d 1127, 1134 (1990) (quoting *Holland v. Nat'l* *Auto. Fibres, Inc.,* Del.Ch., 194 A. 124, 126 (1937)).

of channeling the repurchases through its subsidiaries. Nevertheless, no one who studied the certificate of incorporation should ever have had any other expectation. If the special limitation had been meant to apply to the actions of Sunstates's subsidiaries, the certificate of incorporation could easily have said so.[2]

## II.

The pertinent facts are easily stated. Sunstates Corporation is a Delaware corporation having a number of subsidiaries incorporated in various jurisdictions. Article IV, Section 4.3 of the Sunstates certificate of incorporation creates the $3.75 Preferred Stock. Paragraph 3 thereof specifies the dividend rights of that stock and provides that, unless Sunstates is current in its payment of dividends on the Preferred Stock:

> [t]he Corporation shall not (i) declare or pay or set apart for payment any dividends or distributions on any stock ranking as to dividends junior to the $3.75 Preferred Stock (other than dividends paid in shares of such junior stock) or (ii) *make any purchase ... of ... any stock ranking as to dividends junior or* pari passu *to the $3.75 Preferred Stock ...*

(emphasis added). Paragraph 4(e) of section 4.3 similarly proscribes all non-pro rata purchases of shares of Preferred Stock when dividends are in arrears, as follows:

> [I]n the event that any semiannual dividend payable on the $3.75 Preferred Stock shall be in arrears and until all such dividends in arrears shall have

been paid or declared and set apart for payment, the Corporation shall not ... purchase or otherwise acquire any shares of $3.75 Preferred Stock except in accordance with a purchase offer made by the Corporation on the same terms to all holders of record of $3.75 Preferred Stock for the purchase of all outstanding shares thereof.

Article I, section 1.1 of the certificate defines the "Corporation" to mean Sunstates Corporation. Nothing in the certificate expressly provides that the "Corporation" includes anything but Sunstates Corporation.

In 1991, Sunstates fell into arrears in the payment of the Preferred Stock dividend. Over the next two years, subsidiary corporations controlled, directly or indirectly, by Sunstates bought shares of both common stock and Preferred Stock. The Preferred Shares were not acquired in compliance with the "any and all" tender offer requirement of paragraph 4(e). According to plaintiffs' brief, the repurchases of common stock amounted, over a three year period, to nearly 70 percent of the total outstanding common stock. The Preferred Stock repurchased equaled nearly 30 percent of the total number outstanding.

Plaintiffs point to evidence from which it may be inferred that the decisions to make all these purchases were made by a single person, Clyde Engle. Engle is Sunstates's Chairman and also served as the Investment Officer for Coronet Insurance Company, one of Sunstates's indirect, wholly-owned subsidiaries. Engle controls Sunstates through his ownership control over

---

**2.** Fifty years ago, the fallacy of plaintiffs' argument was recognized in the seminal law review article by Richard M. Buxbaum, Preferred Stock—Law and Draftsmanship, 42 Cal. L.Rev. 243, 257 (1954). In discussing problems in drafting financial restriction clauses in preferred stock contract, Professor Buxbaum stated as follows: "As to all these clauses, *it is vital that all payments, distributions, acquisitions, etc. include those of the subsidiaries; otherwise the provisions can be totally avoided* " (emphasis added).

Telco Capital Corporation, the owner, directly or indirectly, of a majority of Sunstates's common stock. Engle conducted the share repurchase program through Crown Casualty Company and Sunstates Equities, Inc., wholly-owned subsidiaries of Coronet Insurance Company, and through Sew Simple Systems, Inc. and National Assurance Indemnitee Corp., indirect, wholly-owned subsidiaries of Sunstates.

## III.

### A. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] In making this assessment, "the facts of record, including any reasonable hypotheses or inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party...."[4] Of course, unsupported allegations and inferences cannot defeat a summary judgment motion.[5]

### B. Analysis

■ Section 151(a) of the Delaware General Corporation Law allows Delaware corporations to issue stock having such "special rights, and qualifications, limitations or restrictions" relating thereto "as shall be stated and expressed in the certificate of incorporation or of any amendment thereto...." Thus, the law recognizes that the existence and extent of rights of preferred stock must be determined by reference to the certificate of incorporation, those rights being essentially contractual in nature.[6] As was said by this court more than 70 years ago:

> It is elementary that the rights of stockholders are contract rights. The mere word "preferred" unless it is supplemented by a definition of its significance conveys no special meaning. The holder of preferred stock must, therefore, refer to the appropriate language of the corporate contract for the ascertainment of his rights. The nub of the present controversy is—where may such appropriate language be found? The exceptants say in the certificate of incorporation and nowhere else. In this I think they are right.[7]

■ Moreover, the law is settled that, while courts "will employ principles of contract interpretation, and read the Certificate in its entirety to arrive at the intended meaning of the words employed in any specific provision,"[8] stock preferences are to be strictly construed and nothing is to be presumed in their favor.[9] "[A]ny ambiguity must be resolved against granting the challenged preferences, rights or powers."[10]

---

3. Ct. Ch. R. 56(c).

4. *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1375 (1996).

5. *Id.* at 1385.

6. *Warner Communications, Inc. v. Chris–Craft Industries, Inc.,* Del.Ch., 583 A.2d 962, 966 (1989).

7. *Gaskill v. Gladys Belle Oil Co.,* Del.Ch., 146 A. 337, 339 (1929).

8. *Sullivan Money Management, Inc. v. FLS Holdings, Inc.,* Del.Ch., C.A. No. 12731, mem. op. at 5, 1992 WL 345453 (Nov. 20, 1992).

9. *See Waggoner,* 581 A.2d at 1134–35 and cases collected therein.

10. *Sullivan Money Management,* mem. op. at 6 (quoting *Waggoner,* 581 A.2d at 1135).

■ Plaintiffs advance no construction of the certificate of incorporation that would permit me to read the word "Corporation" to refer to any corporation other than Sunstates. This is hardly surprising since the language at issue is clear in its meaning and there is nothing within the four corners of the certificate suggesting a broader or different interpretation. Thus, as a matter of simple contract interpretation, there is no basis on which to apply the special limitation against share repurchases to any entity other than Sunstates.

As earlier mentioned, plaintiffs do make several other arguments that require discussion. First, they argue that the subsidiary corporations making the share purchases were acting as mere agents for Sunstates and, for that reason, the court should treat their acts as those of Sunstates. Second, they argue that the repurchases violated the implied covenant of good faith and fair dealing. I will address these now.

■ Plaintiffs' agency theory is both factually and legally flawed. Factually, the record suggests that the repurchases were made to further the interests of Engle, the person who (through several layers of intermediary corporations) controlled Sunstates, and not Sunstates's own interests. Plaintiffs' brief states at page 6, as follows:

In committing so much money to these repurchases, Engle had two overriding purposes: to prop up the price of Sunstates' common stock, which was the sole asset of Sunstates' parent companies ... and which was the collateral those companies had used for their loans; and to assemble a large enough block of preferred stock to assure that, in the event that the preferred stockholders ever forced an annual meeting and attempted

to exercise their rights to elect half the directors, those shares could be used to block any effort by the class members to secure representation on the Sunstates board [and] assure that [Engle's] hand-picked cronies were re-elected.

Thus, the factual predicate necessary to argue that the purchasing subsidiaries were acting as Sunstates's agents is weak or missing.

■ The legal flaw in the agency argument is more fundamental. For the purposes of the corporation law, the act of one corporation is not regarded as the act of another merely because the first corporation is a subsidiary of the other, or because the two may be treated as part of a single economic enterprise for some other purpose. Rather, to pierce the corporate veil based on an agency or "alter ego" theory, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." [11]

Plaintiffs' brief simply ignores this more difficult standard—offering no record evidence from which I might infer that any of the four corporations making the share repurchases was a sham or existed merely to perpetrate a fraud. On the contrary, the record shows that each of those entities was engaged in substantial business operations and was formed or acquired by Sunstates for purposes relating to the pursuit of normal business operations. In the circumstances, it is clear to me that there is no basis in the record or the law of corporate veil-piercing from which I might infer that the program of share repurchases by those subsidiaries should be treated as though Sunstates, itself, was the buyer.

■ Plaintiffs fare no better in arguing that Sunstates violated the implied covenant of good faith and fair dealing by its subsidiaries' share repurchases. It is true,

11. *Wallace v. Wood*, Del.Ch., 752 A.2d 1175, 1184 (1999).

that, as a general matter, the implied covenant of good faith and fair dealing exists in all contracts. Nevertheless, the circumstances in which it is relied on to find a breach of contract are narrow. As this court has said before:

> ... the duty [arising from the implied covenant] arises *only* where it is clear from what the parties expressly agreed, that they would have proscribed the challenged conduct as a breach of contract ... had they thought to negotiate with respect to the matter.[12]

In this case, the only evidence of what the parties "expressly agreed" is found in the prohibition against certain conduct by the "Corporation." That does not provide a reasonable basis to infer that "the parties would have proscribed" share purchases by Sunstates's subsidiaries "had they thought to negotiate with respect to the matter."

On the contrary, the law of this State has clearly stated for many decades that special rights or preferences of preferred stock must be expressed clearly and that nothing will be presumed in their favor.[13] Thus, there is no basis to infer that any person negotiating the terms of the Sunstates certificate of incorporation could have reasonably believed that the limitation of share repurchases found in Article IV, section 4.3, paragraphs 3 and 4, would preclude repurchase activity by any party other than Sunstates. Indeed, it is more readily inferred that whoever negotiated the Sunstates certificate of incorporation knew and understood the scope of the limitations contained therein.[14]

For similar reasons, I am unable to accept plaintiffs' related argument that the duty of good faith and fair dealing precluded Sunstates from doing indirectly through its subsidiaries that which it was prevented from doing directly itself. It is true that this court has recognized the possibility of applying such a theory to the enforcement of both corporate duties and contract terms governing corporate securities.[15] It has been careful, however, to limit the scope of such application to situations where the subsidiary was newly created for the purpose of evading the duty or the restriction.[16] In *Shenandoah*, for example, Chancellor Allen nowhere suggests that, in the case of a transaction effected by an existing subsidiary, the court would ignore the separate legal existences of the entities involved.[17] Moreover, he focussed

---

12. *Greytak Enters., Inc. v. Mazda Motors of America, Inc.*, Del.Ch., 622 A.2d 14, 22–23 (1992), *aff'd*, Del.Supr., 609 A.2d 668 (1992) (emphasis added).

13. *See supra* notes 7–8.

14. *See supra* note 2. Moreover, "the implied duty to perform in good faith does not come into play" where the topic is either expressly covered in the contract or intentionally omitted therefrom. *Greytak Enters., Inc.*, 622 A.2d at 23. Here, the subject of the scope of the special limitation sued upon is expressly covered in the written contract by the prohibition against the Corporation (defined elsewhere as Sunstates) from making certain share purchases when the Preferred Stock dividend is in arrears.

15. *Barbieri v. Swing–N–Slide Corp.*, Del.Ch., C.A. No. 14239, Steele, V.C., 1997 WL 55956 (Jan. 29, 1997) (fiduciary duties of officers or directors); *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, Del.Ch., C.A. No. 9032, Allen, C., 1988 WL 63491 (June 21, 1988) (indenture restriction).

16. *See, e.g., Shenandoah*, mem. op. at 18.

17. Chancellor Allen was there concerned with the restriction in an indenture prohibiting the redemption of an issuance of debentures by the application, directly or indirectly, of funds borrowed at a lower rate than the debentures. He opined that "[w]hile it is impossible to generalize perfectly concerning all of the situations in which the 'indirectly' language ... might find application, it does appear that the inclusion of that phrase is intended to reach

his analysis on the ultimate economic reality of the actions taken, viewed at the parent company level alone.

In the final analysis, plaintiffs' arguments run counter to both the doctrine of strict construction of special rights, preferences and limitations relating to stock and the doctrine of independent legal significance. The situation is not unlike that confronted in *Rothschild Int'l Corp. v. Liggett Group, Inc.*[18] There, the plaintiffs owned preferred shares that were entitled to a liquidation preference. To avoid paying this preference, the defendant companies structured a combined tender offer and reverse cash-out merger that eliminated the preferred shares for a price substantially lower than the liquidation preference. Construing the charter provision strictly, the Supreme Court concluded that the charter provision only operated in the case of a liquidation and that there had been no liquidation.[19] Applying the doctrine of independent legal significance, the Supreme Court reiterated "that 'action taken under one section of [the DGCL] is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means.' "[20]

## IV.

For these reasons, the defendants' motion for partial summary judgment as to Count II of the Amended Complaint will be granted. An order implementing this decision is enclosed.

situations in which the underlying economic reality of the completed transaction is the functional equivalent of a direct loan for purposes of effectuating a redemption and nothing more." *Shenandoah*, mem. op. at 19. Of course, the provision at issue here does not contain the language "directly or indirectly" and, thus, is more narrow in scope that that addressed in *Shenandoah*.

### ORDER

For the reasons set forth in the Memorandum Opinion dated May 2, 2001, defendants' motion for partial summary judgment as to Count II of the Amended Complaint is GRANTED.

IT IS SO ORDERED.

18. Del.Supr., 474 A.2d 133 (1984).

19. *Id.* at 135–36.

20. *Id.* at 136 (quoting *Orzeck v. Englehart*, Del.Supr. 195 A.2d 375, 378 (1963)).