Manhattan Chrystie St. Dev. Fund, LLC v 215 Chrystie Invs. LLC (2023 NY Slip Op 50730(U))

[*1]

Manhattan Chrystie St. Dev. Fund, LLC v 215 Chrystie Invs. LLC

2023 NY Slip Op 50730(U)

Decided on July 17, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 17, 2023
Supreme Court, New York County

Manhattan Chrystie Street Development Fund, LLC, Plaintiff,

against
215 Chrystie Investors LLC, 215 CHRYSTIE VENTURE LLC, IS COMPANY LLC, THE WITKOFF GROUP LLC, IAN SCHRAGER, STEVEN WITKOFF, ZIEL FELDMAN, SCOTT ALPER, JAMES STOMBER, BERNARD SCHRAGER, HOWARD LORBER, Defendant.

Index No. 651148/2021

Attorneys for Plaintiff:
Jeremy E Deutsch of Cozen O'Connor
Tamar S Wise of Cozen O'Connor
Christian Cangiano of Cozen O'Connor
Attorneys for the Defendants:
Remy J Stocks of Meister Seelig & Fein
Eva Marie Sullivan of Meister Seelig & Fein 
Stephen B. Meister of Meister Seelig & Fein
Benjamin Bianco of Meister Seelig & Fein

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 23, 29, 31 were read on this motion to/for DISMISSAL.
The following e-filed documents, listed by NYSCEF document number (Motion 002) 15, 16, 17, 18, 19, 20, 21, 22, 24, 30, 32 were read on this motion to/for DISMISS.
Plaintiff the Manhattan Chrystie Street Development Fund, LLC (the "company," or "plaintiff") brings this action against defendants 215 Chrystie Investors LLC, 215 Chrystie Venture LLC, IS Company LLC d/b/a The Ian Schrager Company; The Witkoff Group LLC ("The Witkoff Group); Ian Schrager; Steven Witkoff; Ziel Feldman; Scott Alper; James Stomber; Bernard Schrager; and Howard Lorber. Plaintiff asserts six causes of action, including breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference with contract. In motion sequence number 001, all defendants except for Ziel Feldman move to dismiss for failure to state a cause of action, [*2]pursuant to CPLR 3211(a)(7) and 6 Del. C. §18-607(c), and based on documentary evidence, pursuant to CPLR 3211(a). In motion sequence number 002, defendant Ziel Feldman moves, pursuant to CPLR 3211(a)(1) and (a)(7), to dismiss the complaint's fifth cause of action for unjust enrichment, which is the only claim asserted against that defendant in this action.
BACKGROUND
1. Factual Allegations
According to the complaint, on June 26, 2013, plaintiff Manhattan Chrystie Street Development Fund [FN1]
and defendant 215 Chrystie Venture LLC entered into an amended and restated limited liability company agreement (Compl. Ex. A, NYSCEF No. 3) (the "JV agreement") to form a joint venture called 215 Chrystie Investors LLC ("JV") (id. at 8, 44). Defendant 215 Chrystie Venture LLC is the managing member of the JV, and is owned by defendants Witkoff and Schrager (the "Witkoff and Schrager defendants") through their respective entities, the Ian Schrager Company and The Witkoff Group. The complaint further alleges that defendant 215 Chrystie Venture is also indirectly owned by defendants Alper, Feldman, Stomber, Bernard Schrager, and Lorber (id. at 20-34).
Under the JV agreement, plaintiff invested $79.5 million as a preferred equity investment ("preferred equity") in the JV for construction-related expenses for development of the Manhattan Lower East Side development project (the "project"), which included construction of a new 28-story, mixed-use commercial building containing a 374-room PUBLIC-branded hotel — which opened in June 2017 — and 11 residential units (id. at 6, 39, 77). Defendants commissioned an appraisal at the outset of the project that estimated the value of the then- forthcoming hotel at $259 million (id. at 41).
The JV agreement, provides, among other things, as follows:
• Plaintiff would earn a "preferred return" on all advances equal to 5.50% per year, which was due and payable by the JV quarterly on the first day of each January, April, July, and October (id. at 45; JV agreement § 4.04(a)).
• The managing member would "arrange for the Loans for the Project on commercially reasonable terms in furtherance of the applicable Project Cost Statement." (emphasis added) (id. at 49; JV agreement § 3.04(c)).
• Plaintiff must be an "additional notice party in each Loan Document with respect to any notices" on loans for the project (id. at 69; JV agreement § 3.04(c)).
• The managing member shall cause the company to make a distribution of available cash to the managing member; provided, however, that no distributions shall be made if the making of such distributions would adversely affect the company's ability to pay any amounts due to plaintiff (including, without limitation, payment of the preferred [*3]return or the origination fee or a return of the PEP capital contributions) (emphasis added) (id. at 47; JV agreement § 4.04(b)).
The JV agreement also sets forth the circumstances under which the managing member may be removed for cause, including, but not limited to, where the managing member becomes a defaulting member, or willful misconduct of the JV (id. at 50).
The complaint alleges that throughout the development of the project, the managing member made decisions that devalued the hotel and plaintiff's investment (id. at 51). It is alleged that the managing member entered into mezzanine loans that were not for the construction of the project or on commercially reasonable terms, made excessive and improper cash distributions to the managing member, paid self-dealing fees to the managing member, and caused the hotel to underperform.
More specifically, it is alleged that the JV entered into a $41,200,000 Ladder loan in December 2012, then refinanced the Ladder loan in April 2015 with Mass Mutual loans, resulting in $173,250,000 of senior debt and $51,750,000 of mezzanine debt (id. at 52-53). In May 2017, it refinanced the Mass Mutual loans resulting in the Starwood loans: $173,250,000 of senior debt and $106,750,000 mezzanine loans (id. at 54). Finally, in March 2019, the JV refinanced the Starwood loans with Deutsche Bank, resulting in $173,250,000 of senior debt, $30,875,000 senior mezzanine loans, and $30,875,000 junior mezzanine loans (id. at 55-56). Collectively, it is alleged that these mezzanine loans were not commercially reasonable, given the downward trajectory of the hotel real estate market, the significant underperformance of the hotel, and defendants' obligation to repay plaintiff (id. at 70).
In addition to allegedly being commercially unreasonable, it is also alleged that defendants could not have used proceeds from the 2017 and 2019 refinancing in furtherance of the project, as construction of the hotel had already been completed before such refinancing was undertaken (id.). Moreover, it is alleged that plaintiff was not included as a notice party on the 2017 and 2019 loans, as required under section 3.04(c) of the JV agreement (id.).
The complaint also asserts that the unreasonable debt taken on by the managing member coincided with the managing member's decision to pay itself (and the individual defendants) $109,406,464 million in improper cash distributions and unreasonable self-dealing fees (id. at 57-67). Between 2016 and 2019, the JV made cash distributions of up to $78,779,894 to the managing member and, between 2015 and 2019, paid the managing member approximately $30,626,570 in transaction fees (id. at 61, 67). Allegedly, the nature of these distributions was purposely hidden in the JV's audited financial statements. Specifically, it is alleged that defendants switched from reporting both preferred equity and managing member's equity, to merely reporting "member equity," to conceal the fact that the managing member had repaid itself all of its equity, and more, the year the hotel opened (id. at 90). This sudden merging of both members' equity into one line item allegedly hid the fact that the managing member actually had a negative equity balance of $43 million in 2017, rising to a negative equity balance of $88.3 million by 2019 (id. at 82, 88). Thus, by merging both members' equity into one line item, defendants allegedly concealed that they no longer had any equity in the project — only plaintiff's preferred equity remained — while continuing to accumulate debt and make further distributions to themselves.
The complaint further asserts that despite the hotel's initial $259 million appraisal, it lost $15.4 million in 2017, $1.5 million in 2018, and $8.3 million in 2019 (id. at 68). As a result of [*4]mismanagement and fraudulent schemes, the JV allegedly failed to make payments due to plaintiff, totaling at least $8,051,031.25 (id. at 102).
Finally, the complaint asserts that the Witkoff and Schrager defendants acted as alter egos to the managing member and the JV. Specifically, it is asserted that Witkoff and Schrager are principals of the JV; that the managing member is a joint venture between two entities that are respectively and indirectly owned by Witkoff and Schrager; that The Witkoff Group and The Ian Schrager Company served as guarantors under the JV Agreement; that Schrager himself served as the payment guarantor of the Deutsche Bank loan; that corporate formalities were not observed, and that Witkoff and Schrager signed documents on behalf of the managing member (id. at 18, 118, 120-121, 122-126).
The JV agreement contains an unequivocal Delaware choice-of-law provision (see Meister Aff., Ex. A, §11.10; Complaint at 38).
ARGUMENTS
Plaintiff and managing member entered into the JV agreement on June 26, 2013. Under the JV agreement, managing member manages the JV's "ordinary and usual" business and affairs, while plaintiff, by contrast, is granted more limited consent rights over "major decisions," including dissolving or liquidating the JV, amending its organizational documents, or selling substantially all of its assets. Plaintiff alleges that all eleven defendants breached section 3.04(c) of the JV Agreement by entering into excessive mezzanine debt by refinancing the loans encumbering the project in 2012, 2015, 2017 and 2019 (Complaint at 52- 56, 70, 151). Plaintiff likewise maintains that all eleven defendants failed to include plaintiff as an additional notice party on certain of these loans, thereby violating section 3.04(c) again (id. at 107, 152).
Plaintiff further argues that, between 2016 and 2019, the JV made a series of "improper cash distributions" to managing member and that during the same period, the JV paid managing member approximately $30 million in transaction fees (id. at 57-67). Accordingly, plaintiff contends, such conduct on behalf of the JV and/or managing member and/or all eleven defendants constitutes a breach of section 4.04(b) of the JV as this section allows managing member to make distributions to itself only when the JV has enough available cash and when such distributions would not impair JV's ability to pay plaintiff (id. at 102, 135, 136). Moreover, plaintiff contends that since January of 2020, in violation of section 4.04(a), plaintiff has received no preferred return quarterly payments on its investment. Based on such conduct by defendants collectively, plaintiff demands the return of its $79.5 million investment, the preferred return, and removal of managing member for "cause" (id. at 137, 145, 154). Plaintiff alternatively argues that the identical conduct violated defendants' implied covenant of good faith and fair dealing and that Witkoff and Schrager "induced and procured" the JV to breach the JV agreement (id. at 159-165, 173-174).
Finally, plaintiff also asserts that the purportedly improper distributions and related party transaction fees paid to managing member flowed directly to the Witkoff and Schrager defendants, Alper, Stomber, Bernard Schrager and Lorber (id. at 94, 102). Based on those allegations, plaintiff asserts a claim for unjust enrichment.
In response, defendants argue that plaintiff's breach of contract claims fail because plaintiff made an "equity" investment in, not a loan to, the project. Further, plaintiff receives a "preferred return" out of "available cash," rather than "loan interest," and in either event, the "redemption date" for plaintiff's investment is years away — meaning that plaintiff's claims are [*5]not yet ripe.
In addition, defendants question how plaintiff can acknowledge that plaintiff and managing member are the only signatories to the JV agreement, and still assert claims for breach of the JV agreement against Witkoff and Schrager and their respective companies — as purported "alter egos" of managing member. Defendants argue that plaintiff's alter ego allegations are wholly conclusory, are alleged almost entirely "upon information and belief," and amount to little more than a formulaic recitation of the veil-piercing elements. Thus, defendants contend, plaintiff's alter ego allegations fall far short of the exacting standard imposed by Delaware law to disregard the separate legal existence of an LLC and hold its principals liable for the company's contractual obligations.
Defendants also argue that plaintiff's claims for breach of implied covenant, unjust enrichment and tortious interference are impermissibly duplicative of their breach of contract claims and, therefore, they too are subject to dismissal. Finally, defendants assert that plaintiff did not — because it could not — allege that Alper, Stomber, Bernard Schrager or Lorber knowingly accepted any improper distributions, refuting as a matter of law plaintiff's claim of unjust enrichment, and requiring dismissal of this action as against them in its entirety.
In motion sequence number 002, which solely addresses the issue of Ziel Feldman's personal liability, defendant Feldman argues that plaintiff's unjust enrichment claim against him must be dismissed because the claim is based on conclusory allegations that distributions from the project somehow flowed to him personally. Indeed, even if such distributions flowed to Feldman personally, Feldman argues that a valid and enforceable contract precludes plaintiff's ability to assert a quasi-contractual claim for unjust enrichment against him personally. 
LEGAL STANDARD
On a motion to dismiss pursuant to CPLR 3211, "the pleading is to be afforded a liberal construction" and the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v. Martinez, 84 NY2d 83, 87-88 [1994]). However, though well-pled facts are presumed true, "bare legal conclusions and factual claims, which are either inherently incredible or flatly contradicted by documentary evidence...are not presumed to be true on a motion to dismiss for legal insufficiency" (JFK Holding Co., LLC v. City of New York, 68 AD3d 477, 477 [1st Dep't 2009]; see also Robinson v. Robinson, 303 AD2d 234, 235 [1st Dep't 2003] ("[O]n a ... motion to dismiss, the court is not required to accept legal conclusions that are unsupportable based upon the undisputed facts.").
On a motion to dismiss based on documentary evidence under CPLR 3211(a)(1), "[i]f documentary proof submitted in support of the motion disproves a material allegation of the complaint, a determination in the defendant's favor is warranted" (see Snyder v. Voris, Martini & Moore, LLC, 52 AD3d 811, 812 [2d Dep't 2008]).
DISCUSSION
I. Section 18-607 of the Delaware LLC Act Claim
As an initial matter, defendants argue that plaintiff's claims based on distributions prior to February 18, 2018 are time-barred under section 18-607 of the Delaware LLC Act.
The DLLCA provides, in part:
Unless otherwise agreed, a member who receives a distribution from a limited liability [*6]company shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3-year period and an adjudication of liability against such member is made in the said action.
Del. Code Ann. tit. 6, § 18-607(c).
The DLLCA's three-year statute of limitations does not apply to the claims here as a matter of law. Plaintiff asserts that "the majority" of the allegedly improper distributions and fees were "paid to Defendants prior to or simultaneous with the opening of the hotel" in 2017, more than three years before this action was filed on February 18, 2021 (Complaint at 98). Based on such assertion and Section 18-607 of the DLLCA, defendants argue that plaintiff's claims are barred to the extent that they are based on distributions or fees paid before February 18, 2018. However, this is a flawed reading of the statute.
First, the DLLCA creates a cause of action by LLC members to recover unlawful distributions from distributee members (Paul Elton, LLC v. Rommel Delaware, LLC, 2020 WL 2203708, at *15 n.88 [Del. Ch. May 7, 2020]). "Section 18-607 creates a corporate cause of action against LLC members who knowingly receive distributions that improperly strip an LLC of its assets so as to render the LLC insolvent" (id.). Plaintiff does not bring any causes of action under the DLLCA, and the statute does not apply. Courts have further held DLLCA claims may only be brought derivatively, which is also not alleged here (see A.G. Glob. Consulting Inc. v. Global Options Grp., Inc., 2010 WL 11712993, at *1 [SDNY Oct. 26, 2010] ["(T)he governing Delaware law provides that such claims may only be asserted in derivative actions."]).
Second, courts have held that the statutory time bar in Section 18-607(c) is only intended to apply to the cause of action created by section 18-607(a)-(b) of the DLLCA (see A Commc'n Co. v. Bonutti, 55 F Supp 3d 1119, 1126 [SD Ill 2014] [applying Delaware law] ["[T]he Court is further convinced that Delaware's legislature intended subsection (c) to modify the liability set forth in subsection (a) and (b) of Section 18—607]"). Courts have rejected expansive interpretations of the DLLCA that would apply the statute's time bar to claims other than those brought under this section (id. [rejecting application of DLLCA's time bar to breach of fiduciary duty claim against owners of LLC]). Because plaintiff does not bring a claim under the DLLCA, the time bar does not apply.
II. Breach of contract claims
Plaintiff argues that defendants breached sections 3.04(c), 4.04(a), 4.04(b) of the JV agreement. Defendants allegedly breached these sections by entering into commercially unreasonable loans and by failing to include plaintiff as a party to those loans (breach of 3.04(c)); by failing to pay plaintiff an expected return on their investment (breach of 4.04(a)); and by making improper distributions to themselves and the individual defendants (breach of 4.04(b) of the JV agreement). Moreover, plaintiff seeks to impose an alter ego liability on the individual defendants for breaches committed by the JV.
a. Alter ego liability
Plaintiff asserts that the Witkoff and Schrager defendants are liable for purported [*7]breaches of the JV agreement as alter egos of managing member. However, under Delaware law, the separate existence of legal entities is not to be lightly disregarded (BASF Corp. v. POSM II Props. P'ship, L.P., 2009 WL 522721, at *8, fn. 50 [Del. Ch. Mar. 3, 2009]). To state a veil-piercing claim in Delaware, plaintiff must plead facts supporting an inference that the company created a sham entity designed to defraud investors and creditors (U.S. Bank Nat. Ass'n v. U.S. Timberlands Klamath Falls, L.L.C., 2005 WL 2093694, at *1 [Del. Ch. Mar. 30, 2005]. Alter ego liability will be imposed upon a showing that "fraud or injustice would be perpetrated through misuse of the corporate form" (Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, 2004 WL 415251, at * 7 [Del. Ch. Mar. 4, 2004]; In re Sunstates Corp. S'holder Litig., 788 A2d 530, 534 [Del. Ch. 2001]) ("[T]o pierce the corporate veil based on an agency or alter-ego theory, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud"). Courts consider several factors to determine whether to pierce the veil: whether (1) the company was adequately capitalized for the undertaking; (2) the company was solvent; (3) corporate formalities were observed; (4) the dominant shareholder siphoned company funds; and (5) in general, the company simply functioned as a facade for the dominant shareholder (U.S. Bank, 2005 WL 2093694, at *1).
Plaintiff alleges that the Witkoff and Schrager defendants are jointly and severally liable for plaintiff's damages as alter egos of managing member because: (1) the JV was inadequately capitalized, as allegedly evidenced by the amount of loans entered into by the JV; (2) the JV was financially mismanaged, given the JV's default on plaintiff's preferred return; (3) the corporate form was disregarded, as allegedly evidenced by the fact that Witkoff and Schrager themselves owned the managing member, served as principals of the JV, severed as guarantors under the JV agreement, and have personally signed certain project documents; (4) defendants improperly siphoned funds; and (5) alter egos dominated the managing member and JV to enrich themselves as they allegedly caused the JV to enter into loans that were not used to finance hotel construction.
These conclusory allegations are insufficient to confer alter-ego liability. Plaintiff has failed to allege the requisite "fraud or injustice" necessary to support its alter ego claims against the Witkoff and Schrager defendants. Nowhere in complaint does plaintiff allege the JV or managing member are "sham" entities that "exist for no other purpose than as a vehicle for fraud" (In re Sunstates Corp., 788 A.2d at 534). In fact, plaintiff acknowledges that managing member and the JV oversaw the development of the project and hotel operations for the past nine years, thereby refuting any insinuation that the JV exists for no other purpose than as a vehicle for fraud.
Plaintiff's allegations at best amount to a recitation of the veil-piercing elements. For example, although plaintiff alleges in a conclusory manner that the JV was undercapitalized, plaintiff makes no allegation that the JV was inadequately capitalized at the time of formation of the JV. Additionally, plaintiff's allegation that the JV was dominated by managing member is supported by nothing but an allegation that the Witkoff and Schrager defendants caused the JV to enter into loans that were not used to finance hotel construction.
Plaintiff also fails to explain exactly how the corporate form was allegedly disregarded. Plaintiff only asserts that Witkoff and Schrager owned managing member, served as principals of the JV, served as guarantors under the JV agreement, and personally signed certain project documents. Such practices are consistent with regular business practices and with multiple provisions of the JV agreement, and do not indicate any disregard of corporate form. Delaware [*8]law is clear that, to survive a motion to dismiss, plaintiff must plead that the alter ego defendants abused the corporate form to perpetrate the complained-of wrongs (MicroStrategy Inc. v. Acacia Research Corp., 2010 WL 5550455, at *12 [Del. Ch. Dec. 30, 2010] [(dismissing veil-piercing claim pled "in a conclusory fashion" where plaintiff failed to allege "a misuse of the corporate structure"). Plaintiff has failed to allege that the Witkoff and Schrager defendants did so herein. Accordingly, in light of the demanding standard for pleading an alter-ego liability under Delaware law, plaintiff's claims against the Witkoff and Schrager defendants for breach of the JV agreement are dismissed.
b. Breach of section 4.04(a) of the JV agreement
Section 4.04(a) of the JV agreement states as follows:
"[Plaintiff] shall earn a return (the "Preferred Return") on all Advances equal to FIVE AND FIFTY ONE-HUNDREDTHS (5.50%) PERCENT PER ANNUM (the "Rate of Return") . . . which shall be due and payable by the [JV] to [Plaintiff] on the first (1st) day of each and every January, April, July and October (each, a "Payment Date") until PEP Member [FN2]
shall have received a return of the entire PEP Capital Contributions . . ." (emphasis added).
(JV LLC agreement § 4.04[a]).
Plaintiff contends that since January of 2020, in violation of section 4.04(a), plaintiff received no preferred return payments on its investment. Plaintiff seeks to recover the preferred return payments and asserts a breach of contract claim against the JV, managing member, and the Witkoff and Schrager defendants. Because plaintiff has failed to establish alter ego liability, as discussed in section II(a) of this decision, a claim for breach of section 4.04(a) of the JV agreement is dismissed as it relates to Witkoff and Schrager defendants.
In its brief in support of the motion to dismiss, defendants admit that plaintiff has received no preferred return payments since January of 2020, but defendants point out that the express language of section 4.04(a) provides that the JV — and not managing member — is obligated under the JV agreement to pay the preferred return to plaintiff. Defendants are correct. The language of the section clearly indicates that the JV must pay all advances to plaintiff on a quarterly basis and assigns no similar responsibility to the managing member (id.).
Furthermore, the JV agreement further expressly disclaims liability of managing member for the contractual obligations of the JV. Specifically, section 5.01 of the JV agreement provides that:
The Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that each Member shall be personally liable for the payment of its Capital Contributions, and as otherwise set forth in this Agreement, the Act and any other applicable law.
Accordingly, plaintiff's section 4.04(a) claim is dismissed against managing member. However, since defendants do not dispute that plaintiff has received no preferred return payments since January of 2020, and since the JV was obligated to provide for such payments under section 4.04(a), plaintiff's claim for the breach of section 4.04(a) as it relates to the JV survives defendants' motion to dismiss.
c. Breach of sections 4.04(b) and 3.04(c) of the JV agreement
Section 4.04(b) provides as follows:
At such times as the Company has Available Cash, the Managing Member shall cause the Company to make a distribution of such Available Cash to the TWG/ISC Member, provided, however, that no distributions shall be made if the making of such distributions would adversely affect the Company's ability to pay any amounts dues [sic] to PEP Member provided hereunder (including, without limitation, payment of the Preferred Return or the Origination Fee or a return of the PEP Capital Contributions), violate the Act, any restriction imposed by this Agreement or any loan agreement, debenture or promissory note or other material contract, agreement or instrument by which the Company is bound. (emphasis added).
Section 3.04(c) provides:
"Managing Member shall accomplish and complete, for and on behalf of the [JV] with reasonable diligence and in a prompt and businesslike manner, exercising such care and skill as a prudent developer and owner with sophistication and experience in developing, owning and operating projects like the Project would exercise in dealing with its own property, all of the following duties . . . (c) arrange for the Loans for the Project on commercially reasonable terms in furtherance of the applicable Project Cost Statement . . . ." JV LLC Agreement § 3.04 (emphasis added).
Plaintiff alleges that defendants breached section 4.04(b) by making improper distributions of tens of millions of dollars to managing member. Between 2016 and 2019 — before the hotel opened and in the first 30 months of hotel operations — defendants allegedly paid themselves up to $78 million in distributions. Plaintiff argues that these improper distributions have already adversely affected the JV's financial wellbeing and, in conjunction with foreseeably declining market conditions, have rendered the JV unable to pay amounts due to plaintiff under the JV.
Additionally, plaintiff alleges that defendants breached section 3.04(c) by failing to include plaintiff as an additional notice party in each loan document and by entering into loans that were not in the furtherance of the project. Specifically, plaintiff alleges that defendants did not use the proceeds of the mezzanine debt in furtherance of the project, as construction of the hotel had already been completed by the time the loans were entered into.
Plaintiff asserts these claims against both the JV and managing member. However, both sections 4.04(b) and section 3.04(c) address solely managing member's obligations, and neither of the sections assign any responsibility to the JV. Section 4.04(b) provides that "at such times as the Company has Available Cash, the Managing Member shall cause the Company to make a distribution of such Available Cash to the TWG/ISC Member" (emphasis added). Similarly, section 3.04(c) requires "managing member to arrange for Loans for the Project on [*9]commercially reasonable terms" (emphasis added). Thus, it is clear that the JV has no obligations under either section 4.04(b) or section 3.04(c). Accordingly, plaintiff's claims for the breach of sections 4.04(b) and 3.04(c) of the JV agreement are dismissed as they relate to the JV itself.
Thus, a remaining issue is whether plaintiff alleges sufficient facts to survive managing member's motion to dismiss plaintiff's claims for the breach of sections 4.04(b) and 3.04(c). Although managing member implies in its papers that managing member was allowed to make the distributions that it made and that the above-mentioned mezzanine loans were entered into with commercially reasonable terms, managing member does not directly refute plaintiff's allegations that defendants breached sections 4.04(b) and 3.04(c). Instead, managing member argues that plaintiff's breach of contract claim is merely unripe. Specifically, managing member cites to the mandatory redemption clause of the JV agreement, which provides that:
On the date (the "Mandatory Redemption Date") that is sixty (60) months following the date of the first Advance (the "First Advance Date"), the Managing Member shall cause the Company to redeem the entire interest of [Plaintiff] in the Company (the "PEP Redemption"); provided, however, that during the period commencing on the date which is no earlier than ninety (90) days prior to the Mandatory Redemption Date and expiring on the Mandatory Redemption Date, the Managing Member shall have the right, by providing a written notice to [Plaintiff], to cause the extension of the Mandatory Redemption Date by sixty (60) months (such extended date, the "Extended Mandatory Redemption Date") and in the event of the exercise of such extension, the Company shall redeem the entire interest of [Plaintiff] in the Company at any time following the Mandatory Redemption Date but in no event later than the Extended Mandatory Redemption Date. (emphasis added).
Section 7.03 of the JV agreement.
Under section 7.03, managing member has a right to extend the mandatory redemption date for 60 months so long as it provides plaintiff with a written notice of an intention to exercise that right. In other words, section 7.03 establishes a right of the managing member to delay paying plaintiff any payments related to plaintiff's investment in the JV — whether they relate to the principal payment or the accrued interests — for up to five years, or 60 months. Defendants claim, and plaintiff does not deny, that the JV, in accordance with this provision, exercised such right on January 7, 2020, by timely serving plaintiff with written notice that the JV would extend the mandatory redemption date to April 6, 2025. Thus, defendants argue that to the extent that plaintiff has suffered any monetary damages related to its investment in the JV, under section 7.03 of the JV agreement, defendant is not obligated to pay those damages until April of 2025. In other words, defendants argue that by bringing this lawsuit in 2021, as opposed to waiting until 2025, plaintiff is effectively trying to plead a contractual right to accelerate the extended mandatory redemption date when, the JV agreement provides for no such right. In short, defendants contend that plaintiff's claim is not yet ripe and that contract between the parties mandates bringing any claims related to plaintiff's investment in the JV only after April of 2025.
Defendants' argument is not persuasive. Although the JV agreement contains no acceleration of the mandatory redemption date provision, plaintiff is allowed to commence this lawsuit prior to the expiration of the mandatory redemption date. This is because under the Delaware law, a cause of action accrues at the time of the wrongful act (ISN Software Corp. v. [*10]Richards, Layton & Finger, P.A., 226 A3d 727, 732 [Del. 2020]). More specifically, "[f]or contract claims, the wrongful act occurs at the time a contract is breached" (id.). Thus, a breach of contract claim accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained" (id.). This means that plaintiff in this case is not obligated to wait until April of 2025 to file a breach of contract claim, because plaintiff's claim became ripe at the point when the contract was breached.
A case that addresses this issue squarely is Shareholder Representative Services LLC v. Alexion Pharmaceutical, Inc (2021 WL 3925937 [Del. Ch. 2021]). In Alexion, through a 2018 merger with Syntimmune, Inc., Alexion acquired SYNT001, a medication in development which aimed to treat rare autoimmune diseases. In return, Syntimmune's securityholders received $400 million in cash, with the possibility of an additional $800 million in earn-out payments based on SYNT001's further development and performance. These additional payments were to be triggered by eight different milestones. Additionally, Alexion also committed to a standard of diligence in pursuit of those milestones for the first seven years after closing. Specifically, section 3.08(a) of the merger agreement between the parties provided that:
"For a period of seven (7) years following the Closing Date, [Alexion] shall and shall cause its Affiliates (including the Company) to use Commercially Reasonable Efforts to achieve (or cause its Affiliates, licensees or sublicensees with respect to rights to develop or commercialize the Product to achieve) each of the Milestone Events."
In January of 2020, Alexion filed public disclosures showing that SYNT001's development had fallen behind schedule and that multiple clinical trials were canceled. Based in part on Alexion's public disclosures, shareholders filed a complaint asserting, among other things, that Alexion breached the merger agreement by failing to use commercially reasonable efforts in developing SYNT001 under section 3.8(a). In response, like defendants in this case, Alexion filed a motion to dismiss, recognizing that shareholders have stated a claim for breach of contract, but arguing that the plaintiffs' claim was not yet ripe. Alexion argued that under section 3.08(a), Alexion is given an opportunity to exercise commercially reasonable efforts for seven years and that any allegation by plaintiffs that Alexion failed to exercise such efforts must be dismissed prior to expiration of those seven years. In other words, Alexion argued that because the commercially reasonable efforts period lasted seven years, Alexion still had nearly five years to achieve the milestone events without breaching the merger agreement.
The Court of Chancery dismissed Alexion's argument, holding that plaintiff's claim was ripe for litigation. In so doing, the court recognized that Delaware courts must engage in a "common sense assessment" when evaluating whether a claim is ripe. Specifically, the court stated that a ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form. Further, the court highlighted that generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static (Alexion, 2021 WL 3925937 5* quoting XI Specialty Ins. Co. v. WMI Liquid. Tr., 93 A3d 1208, 1217—18 [Del. 2014]; further quoting Stroud v. Milliken Enters., Inc., 552 A2d 476, 480 [Del. 1989], then quoting Julian v. Julian, 2009 WL 2937121, at *3 [Del. Ch. Sept. 9, 2009]). Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention (id.).
The Alexion court recognized that ripeness also implicates the closely related question of when a claim accrues. In contrast to other states, Delaware applies an "occurrence rule" to determine when a cause of action accrues (ISN Software Corp. v. Richards, Layton & Finger, P.A., 226 A3d 727, 732 [Del. 2020]). Generally, "a cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action" (id.). More specifically, a breach of contract claim accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained" (id.). Absent tolling, the accrual of a cause of action starts the clock on the statute of limitations (id.). To give a plaintiff the full benefit of the statute of limitations period, a consistent understanding of claim "accrual" must be applied in the ripeness context (id.). 
Consistent with the outlined law, the Alexion court concluded that because shareholders alleged that Alexion, in breach of the merger agreement, stopped using commercially reasonable efforts by October of 2019, the shareholders' claim accrued no later than that date. At that point, the claim also ripened because the shareholders claims were static, as shareholders' claim depended on Alexion's past conduct. Thus, the shareholders' claim was ripe for litigation, notwithstanding the length of the applicable commercially reasonable efforts provision.
Here, plaintiff alleges that sections 4.04(b) and 3.04(c) were breached between 2016 and 2019, when defendants allegedly paid themselves up to $78 million in improper distributions and when defendants entered into multiple mezzanine loans without adding plaintiff as a party to those loans. At the motion to dismiss juncture, where courts must "accept the facts as alleged in the complaint as true and accord plaintiffs the benefit of every possible favorable inference" (Leon v. Martinez, 84 NY2d 83, 87-88 [1994]), such allegations constitute the type of static facts that established ripeness in Alexion. Although the JV agreement provides that the managing member may extend the mandatory redemption date for 60 months following a proper notice, plaintiff was not required to wait until 2025 to commence this action. As already stated, Delaware courts apply an "occurrence rule" and routinely hold that breach of contract claims accrue at the time the contract is broken, not at the time when actual damage results or may be ascertained. Considering that plaintiff alleged that the JV agreement was broken on multiple occasions between the period of 2016 and 2020, and because plaintiff's claims entirely depend on managing member's past conduct that occurred during that period, plaintiff has established ripeness and is entitled to proceed with its claim for the breach of sections 4.04(b) and 3.04(c) of the JV agreement, as alleged against managing member.
d. Removal of managing member for "cause"
In addition to seeking monetary damages, plaintiff also demands removal of managing member for "cause" (Complaint at 137). As an initial matter, the JV agreement provides that any managing member could be removed from that position if plaintiff can establish "cause," which is defined as "the breach in any material respect of any material obligation of the Managing Member under the terms of this Agreement" (JV agreement at 3). Considering that plaintiff set forth allegations of numerous acts purportedly constituting material breaches, including breaches of sections 4.04(b) and 3.03(c) of the JV agreement, plaintiff, at this juncture, has alleged sufficient facts that would ordinarily constitute "cause."
Defendants argue, however, that the JV agreement imposes several procedural conditions precedent to removing managing member for cause and that some of those conditions have not [*11]been fulfilled. Defendants are correct. Section 3.01 of the JV agreement provides:
[I]n no event shall the Managing Member be removed until [Plaintiff] obtains and delivers to the Managing Member the prior written consent of each applicable Lender to such removal and replacement of the Managing Member as and to the extent such approval is required under such Lender's Loan Documents, and any attempted removal of the Managing Member without first obtaining such consent shall be null and void and of no force or effect (emphasis added).
And while defendants recognize that plaintiff served managing member with removal notice on January 8, 2021, defendants argue that plaintiff failed to first obtain the consent of each of the JV's lenders to remove managing member. Plaintiff responds by arguing that it is implausible that plaintiff could have obtained the consent of each lender to remove the managing member prior to sending the notice, since the managing member failed to inform plaintiff of the terms of, or even provide complete copies of, all loan documents.
And although it would be implausible to require plaintiff to obtain consent letters from the lenders that plaintiff claims it didn't even know exist, plaintiff failed to establish that it received consent from lenders of which plaintiff certainly had knowledge. Specifically, plaintiff attempted to receive consent from Deutsche Bank for removal of the managing member, but on March 15, 2021, Deutsche Bank specifically declined to provide such consent (see Meister Aff., Ex. B.) Absent Deutsche Bank's consent, plaintiff's January 8, 2021 notice of removal is deemed void and of no force and effect. Accordingly, plaintiff's claim for removal of managing member for "cause" is dismissed, because undisputed documentary evidence establishes that at least one lender has explicitly denied giving consent to the removal of the managing member, and the JV agreement requires unanimous consent among all lenders.
III. Implied covenant of good faith and fair dealing
In the alternative to the breach of contract claims, plaintiff alleges that managing member willfully breached the implied covenant of good faith and fair dealing by scheming to overleverage the project and subordinate plaintiff's equity investment to unreasonable amounts of debt. At its essence, plaintiff's good faith and fair dealing claim is based on the exact same facts as its breach of sections 4.04(b) and 3.04(c) claims.
Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract by operation of law. The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain (Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc., 2018 Del. Ch. LEXIS 182, *1, 2018 WL 2727542). However, the implied covenant is available only where the terms to be implied are missing from the contract (Fitzgerald v. Cantor, 1998 Del. Ch. LEXIS 212, 1998 WL 842316, at *1 [Del. Ch. Nov. 10, 1998]). Thus, if the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable (Narrowstep, Inc. v. Onstream Media Corp., 2010 Del. Ch. LEXIS 250, 2010 WL 5422405, at *12 [Del. Ch. Dec. 22, 2010]; see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC, 27 A.3d 531, 539 [Del. 2011] ["A party may maintain a claim for breach of the implied covenant of good faith and fair dealing only if the factual allegations underlying the implied covenant claim differ from those [*12]underlying an accompanying breach of contract claim"]).
Here, plaintiff's breach of implied covenant of good faith and fair dealing claim is based on the same facts as its breach of contract claim. More specifically, plaintiff's implied covenant claim is based on the same nucleus of facts as plaintiff's breach of contract claims based on of sections 4.04(b) and 3.04(c). As the complaint herein alleges claims of breach of contract and breach of the implied covenant based on the same facts and seeks the same relief under each claim, the latter claim is dismissed as redundant and duplicative.
IV. Unjust Enrichment
Plaintiff also asserts a claim for unjust enrichment against all defendants. Plaintiff argues that defendants willfully schemed to enrich themselves by making enormous payments of cash to managing member, including through the payment of over $30 million in fees, while the JV remained overleveraged and undercollateralized. Plaintiff asserts that at least some of those fees self-paid to defendants through this project were benefits to which they were not entitled, and that it would be contrary to equity and good conscience to permit defendants to retain such monies, inasmuch as they were received at the expense of plaintiff.
As an initial matter, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience" (Schock v. Nash, 732 A2d 217, 232 [Del. 1999)]. To state a claim for unjust enrichment, a plaintiff must allege: (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law (Bakerman v. Sidney Frank Importing Co., 2006 WL 3927242, at *18 [Del. Ch. Oct. 10, 2006] [quoting Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 [Del. Ch. 1999]]).
Nevertheless, where a complaint "alleges an express, enforceable contract that controls the parties' relationship, a claim for unjust enrichment will be dismissed" (Bakerman, 2006 WL 3927242, at *18; see also Albert v. Alex. Brown Mgmt. Servs., 2005 WL 2130607, at *8 [Del.Ch. Aug.26, 2005][dismissing unjust enrichment claim where plaintiff alleged that partnership agreement and fiduciary duties governed the parties' relationship]). "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied." (LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC, 2018 WL 1559936, at *16 [Del. Ch. Mar. 28, 2018]).
In attempt to avoid application of these fundamental principles, plaintiff argues that the JV agreement itself constitutes unjust enrichment in that it purportedly enabled defendants to obtain benefits to which they were not entitled. Plaintiff, however, does not purport to state a claim for fraud or breach of fiduciary duty, nor does it seek to set aside the JV agreement as the product of wrongdoing. To the contrary, plaintiff not only admits that the JV agreement governs the parties' relationship, but it is seeking to enforce its terms against defendants. Thus, because the JV agreement governs the parties' relationship, plaintiff has failed to state a claim for unjust enrichment against each of the named defendants.
V. Tortious interference with contract
Plaintiff alleges that defendants Witkoff and Schrager knowingly and intentionally [*13]induced and procured the JV to willfully breach the JV agreement. More specifically, plaintiff alleges that Witkoff and Schrager had actual knowledge that the JV would be willfully breaching the JV agreement if it (i) failed to pay the preferred returns due to plaintiff under section 4.04(a), (ii) made distributions to the managing member that would adversely affect the JV's ability to repay plaintiff's investment in breach of Section 4.04(b), and (iii) entered into loans that were neither commercially reasonable nor in furtherance of the project and failed to name plaintiff as a notice party under the JV's loan documents.
Under Delaware law, for a plaintiff to recover for tortious interference with contractual relations, "[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury" (Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A2d 983, 992 [Del. Ch. 1987]). However, courts in Delaware recognize that companies which are affiliated though common ownership are shielded from "tortious interference with contract claims when the companies act in furtherance of their shared legitimate business interests" (James Cable, LLC v. Millennium Digital Media Sys., L.L.C., 2009 WL 1638634, at *4 [Del. Ch. June 11, 2009]; see also Shearin v. E.F. Hutton Grp, Inc., 652 A2d 578, 589 [Del. Ch. 1994]).
The so-called affiliate privilege affords "a defense to overbroad attacks on the 'justification' for a controller's involvement with its affiliates' contracts that might otherwise convert any of the controller's business judgments into personal guarantees" (Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC, 2021 WL 117036, at *6 [Del. Super. Jan. 13, 2021]). Where the breaching party and the controller are affiliated through common ownership, a plaintiff must rebut the presumption that the controller was "pursuing its legitimate profit-seeking interests in good faith" by plausibly alleging that its "sole motive in interfering was bad faith to injure plaintiff" (id., at *7 [internal citations omitted]). Where it fails to do so, the affiliate privilege "protects the controller from primary or vicarious tort liability for the breach of a contract connected to its enterprise but to which the controller itself was not a signatory" (id.).
As plaintiff acknowledges, Witkoff and Schrager control the JV by virtue of their common ownership of managing member (Complaint at 9). While the complaint includes a single conclusory allegation that Witkoff and Schrager acted in "bad faith," the complaint contains no allegation that Witkoff and Schrager acted out of malice toward plaintiff, let alone that their "sole motive in interfering was bad faith to injure" plaintiff. Plaintiff has therefore failed to rebut the presumption of the affiliate privilege, requiring dismissal of its tortious interference claim.
CONCLUSION
Accordingly, it is
ORDERED that the motions (sequence numbers 001 and 002) of defendants 215 Chrystie Investors LLC, 215 Chrystie Venture LLC, IS Company LLC d/b/a Ian Schrager Company; the Witkoff Group LLC; Ian Schrager; Steven Witkoffl; Scott Alper; James Stomber; Bernard Schrager; and Howard Lorber; and Ziel Feldman to dismiss the complaint are granted in part and denied in part; and thus, it is
ORDERED that the complaint is dismissed in its entirety as against defendants the IS Company LLC, The Witkoff Group LLC, Ian Schrager [in his personal capacity], and Steven Witkoff [in his personal capacity] for breach of the JV agreement because plaintiff has not [*14]demonstrated that the IS Company LLC, The Witkoff Group LLC, Ian Schrager, and Steven Witkoff acted as alter egos of the managing member; and it is further
ORDERED that the complaint's first cause of action for breach of section 4.04(a) of the JV agreement is dismissed to the extent it is asserted against defendant 215 Chrystie Venture LLC; and it is further
ORDERED that the complaint's second cause of action for breach of section 4.04(b) of the JV agreement is dismissed to the extent it is asserted against defendant 215 Chrystie Investors LLC; and it is further
ORDERED that the complaint's third cause of action for breach of section 3.04(c) of the JV agreement is dismissed to the extent it is asserted against defendant 215 Chrystie Investors LLC; and it is further
ORDERED that the complaint's second and third causes of action are dismissed to the extent they seek removal of the managing member for "cause"; and it is further
ORDERED that the complaint's fourth cause of action for breach of the implied covenant of good faith and fair dealing is dismissed; and it is further
ORDERED that the complaint's fifth cause of action for unjust enrichment is dismissed; and it is further
ORDERED that the complaint's sixth cause of action for tortious interference with contract is dismissed; and it is further
ORDERED, therefore, that the Clerk of the Court is directed to enter judgment in favor of defendants IS Company LLC, The Witkoff Group LLC, Ian Schrager, Steven Witkoff, Ziel Feldman, Scott Alper, James Stomber, Bernard Schrager, and Howard Lorber, with costs and disbursements as taxed by the Clerk; and it is further
ORDERED that the balance of the action herein is severed and shall continue as against defendants 215 Chrystie Investors LLC and 215 Chrystie Venture LLC; and it is further
ORDERED that motion sequence number 001 is denied to the extent that plaintiff has alleged sufficient facts to state a cause of action for breach of section 4.04(a) of the JV agreement as alleged against defendant 215 Chrystie Investors LLC; and to the extent that plaintiff has alleged sufficient facts to state a cause of action for breach of sections 4.04(b) and 3.04(c) of the JV agreement as alleged against defendant 215 Chrystie Venture LLC.
DATE July 17, 2023
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1:Plaintiff is a special purpose entity formed by the New York City Regional Center and is authorized by the United States Citizenship and Immigration Services to secure foreign investments in U.S. real estate and infrastructure projects under the EB-5 Immigrant Investment Program. The EB-5 Program was established by Congress in 1991 to stimulate economic development and create jobs through foreign investment (See 8 CFR § 204.6 - Petitions for employment creation immigrants).

Footnote 2:Under the recitals of the JV LLC agreement, "PEP Member" is defined as the Manhattan Chrystie Street Development Fund, LLC, which is the named plaintiff in this action.